565 F.2d 864
 MARYLAND PUBLIC INTEREST RESEARCH GROUP, Appellees,
v.
Wilson H. ELKINS, Individually and as President of the
University of Maryland, Robert Gluckstern, Individually and
as Chancellor of the College Park Campus University of
Maryland, Board of Regents of the University of Maryland, B.
Herbert Brown, Hugh A. McMullen, Samuel H. Hoover, L. Mercer
Smith, William G. Connelly, N. Thomas Whittington, Jr., Mary
H. Broadwater, Hon. Young D. Hance, Edward V. Hurley, Louis
L. Kaplan, Peter F. O'Malley, Judith S. Sachwald, John C.
Scarbath, Hon. Joseph D. Tydings, Individually and as
Members of the Board of Regents of the University of
Maryland, Appellants.
 No. 77-1250.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 9, 1977.
Decided Nov. 21, 1977.
 
 Steven P. Resnick, Asst. Atty. Gen., Baltimore, Md. (Francis B. Burch, Atty. Gen. of Md., David Feldman, Mary Elizabeth Kurz, J. Terrance Roach, and Robert A. Zarnoch, Asst. Attys. Gen., Baltimore, Md., on brief), for appellants.
 Girardeau A. Spann (Alan B. Morrison, Washington, D. C., Gary Howard Simpson, Bethesda, Md., on brief), for appellees.
 Before BRYAN, Senior Circuit Judge, and RUSSELL and HALL, Circuit Judges.
 ALBERT V. BRYAN, Senior Circuit Judge:
 
 
 1
 This First Amendment[1] case questions the right of the Board of Regents, the governing body of the University of Maryland, College Park Campus, to forbid a recognized student organization to use its share of the institution's required student-activities-fees for purposes of litigation.[2]
 
 
 2
 The organization, styled the Maryland Public Interest Research Group (MaryPIRG), was accorded official standing at the University "to advocate the public interest in areas of concern to students enrolled in the College Park Campus". Sponsored projects are those designed to enhance the educational experience of its volunteers through participation in investigation, study and exposition of current social problems among the student body as well as the people generally. Among others, these comprehended unjust apartment rents, discriminatory employment practices, secrecy of Government papers, public health research and official misconduct of public and University officials. It is staffed not only by students but also with attorneys who provide the counselling where legal matters are implicated. In its areas, MaryPIRG pleads, it needs resort to the courts for substantive relief advancing its goals, particularly in seeking information from Governmental agencies.
 
 
 3
 The group received the approval of the Student Government Association (SGA), the agency responsible for advising the University on allocations of the student-activities-fees. SGA receives a budget from each student activity detailing the funds desired for pursuit of its enterprises. This submission, after evaluation by SGA, is passed on to the Regents for approval, modification or rejection.
 
 
 4
 Beginning in the 1974-75 academic year, MaryPIRG asked for an allowance by SGA to include moneys for "project expenses" consisting of litigation costs. The request was granted in a reduced sum. Thereafter the Regents approved the SGA recommendation, "on the condition that (MaryPIRG) not use any of the funds so appropriated to pay litigation expenses". This limitation has continued in subsequent years, although larger amounts have been allocated to MaryPIRG for its general aims.
 
 
 5
 Suit was commenced by MaryPIRG in December 1975 challenging the litigation restriction as trenching upon its "first amendment rights to free expression and association, and to petition the government for a redress of grievances", with the last including, as it does, access to the courts.[3] While other sanctuaries were alleged as invaded, these issues were not reached by the trial court and are not presented on this appeal. The President of the University and the Board of Regents, as well as the other concerned defendants answered, denying the incursion and explaining that MaryPIRG was not denuded of its right to litigate, but only barred from using in that way funds derived from the University. Furthermore, in response it maintained that the restriction squared with the University's obligation to all students: to expend funds only for educational purposes.
 
 
 6
 With no factual dispute before him, the District Judge summarily upheld MaryPIRG's claimed First Amendment grievances and enjoined enforcement of the litigation exclusion, apparently relying on Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). On the defendants' appeal, we conclude that the University acted within its prerogatives, without "abridging" the plaintiff's privileges, and not contrary to the law of Sindermann.
 
 I.
 
 7
 Freedom to sue has not been denied MaryPIRG by the Board's resolve. Only the direction of State funds to that end has been withdrawn; otherwise it may go to court unreservedly. Moneys received as gifts, contributions or from other sources, such as "several Maryland campuses", may be devoted to such ends as MaryPIRG may wish. Actually the restriction is not a bar practically, for the record reveals that there are in truth such outside funds available and reasonably to be anticipated. The sum sought of the University for this purpose was budgeted at $1,760.00 in the academic year when the limitation was enacted and this suit begun. At the same time the overall request was for $37,997.00, of which SGA approved $25,437.00. Of this amount only $850.00 was allotted to "project expenses", the item including suit money. This analysis demonstrates how slight was the Board's deprivation and how readily other assists to MaryPIRG could carry litigation.
 
 
 8
 These figures destroy the slightest hint of discrimination. Other proofs evincing fair treatment of MaryPIRG are these: its participants are credited on their academic records for their work; office space is provided on campus; and procurement of furniture is assisted. In 1974 it was the beneficiary of the next to largest share of student-activity-fees among the 40 campus groups, and in 1975-76 the largest, $38,619.00, was accorded the plaintiff. Even after the litigation embargo was actuated MaryPIRG was granted the equivalent of its previous year's allowance.
 
 
 9
 There is no affirmative commandment upon the University to activate MaryPIRG's exercise of First Amendment guarantees; the only commandment is not to infringe their enjoyment. Presently, no such result has been incident to the promulgation of the restriction. In reality, the plaintiff is asking the Board to finance the plaintiff's assertion of the Amendment. In this it cannot succeed. Commarano v. United States, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959). The Court there saw no overstepping of Constitutional barriers in the Government's consequential discouragement of programs of publicity obviously a First Amendment privilege directed against legislative proposals by disallowing the contributions thereto as deductions in income tax returns for "ordinary and business" expenses. Id. at 513, 79 S.Ct. 524. If such a restriction may be indulged the Federal Government, a fortiori, a like immunity may be permitted the University. Either may put the cost thereof upon those who exercise it rather than upon those who simply abide it.II.
 
 
 10
 The thesis for the decision on review, thoughtfully expounded by the District Judge, is that the Board of Regents could not constitutionally prevent the use of student-activities-fees for litigation by MaryPIRG a form of prior restraint without advancing a compelling State interest sufficient to justify an exception to the First Amendment's preclusion. The burden of this showing, he believed, was upon the Regents. Cf. Healy v. James, 408 U.S. 169, 184, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). But even accepting this premise arguendo, it cannot be doubted that the facts here demonstrated a State interest so compelling as to remove its action from the play of the Amendment.
 
 
 11
 To begin with, in the circumstances the employment of the mandatory fees is primarily a determination for the Board. Ex facie it is a concern within its governmental province a matter intra vires the Board. Further, we cannot see the limitation as an ill-advised policy or abused discretion. On the contrary, its soundness is testified to by the well recognized considerations now to be mentioned. The group is already provided the counsel of lawyers. As its members are not law students, litigation would not be a form of education for them. Throughout pendency, from commencement to judgment, suits and actions would assume in the public mind the stature of declarations of University thought as well as that of its entire student body, while in truth it could well be neither.
 
 
 12
 In this vein, it is important to know that MaryPIRG and its operation find many students in disagreement with its creed. Hence, without the restriction the Regents could find themselves devoting moneys, in part forcibly demanded of the dissidents, to causes distasteful to them. A further understandable motivation of the Board was the apprehension that litigation by MaryPIRG could result in assessment of costs, or judgments for other liabilities, against it, in the event of unsuccess at trials. The Board prefers that the University stand neutral, both actually and apparently. Other instances are not hard to conceive, justifying the wisdom of a prohibition of the outlay of fees to finance litigation.
 
 
 13
 The facts alone in this case create compelling grounds for letting the Board's restriction survive the exactions of the First Amendment.
 
 
 14
 The decree and orders on appeal must be set aside.
 
 
 15
 Vacated.
 
 
 
 [1]
 "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people . . . to petition the Government for a redress of grievances."
 
 
 [2]
 The District Court explicitly confined its decision to First Amendment considerations as made applicable to the State by the Fourteenth Amendment
 
 
 [3]
 Jurisdiction was laid under 28 U.S.C. § 1343(3)