The STUDENT GOVERNMENT ASSOCI-
ATION of the undergraduate students
of the University of Massachusetts at
Amherst; The Graduate Student Senate
of the graduate students of the Univer-
sity of Massachusetts at Amherst; The
Legal Services Offices Governing
Board of the University of Massachu-
setts at Amherst; David Horowitz;
George W. Claxon, II; On behalf of
themselves and all others similarly situ-
ated, Plaintiffs,

v.

The BOARD OF TRUSTEES OF the
UNIVERSITY OF MASSACHUSETTS,
David C. Knapp, Joseph H. Duffy, Den-
nis L. Madson, Franklyn D. Donant,
Defendants.

Civ. A. No. 86–3396–T.

United States District Court,
D. Massachusetts.

Dec. 4, 1987.

Richard W. Cole, Laurie A. Morin, Stahlin & Bergstresser Inc., Boston, Mass., for plaintiffs.

William Searson and Peter B. Ellis, Foley, Hoag & Eliot, Boston, Mass., for defendants.

**MEMORANDUM**

TAURO, District Judge.

This action for declaratory and injunctive relief was brought by three student groups and three [1] individual students at the University of Massachusetts at Amherst against the Board of Trustees of the University and four University officials. The complaint alleges that the defendants conspired and acted to violate plaintiffs' First Amendment rights to speak and associate freely, and to petition the government with grievances. Presently at issue is defendants' motion for summary judgment.

I.

The University of Massachusetts ("UMass") is a part of the Massachusetts system of public institutions of higher education, established by the Massachusetts General Laws.[2] The board of regents of higher education governs the higher education system.[3] Each institution within the system, including UMass, has its own board of trustees.[4] The UMass board of trustees (the "Board") manages the University's two campuses, in Boston and Amherst.

In 1974, the Board established the Legal Services Offices (the "LSO") as an administrative unit of the University. The LSO consisted of several attorneys and various administrative and clerical staff. It provided legal advice, representation, referral services and educational services to UMass students.

As originally created, the LSO did not have authority to represent students in litigation against UMass[5] or in criminal mat-

1. Plaintiff Paul Wingle was voluntarily dismissed on June 29, 1987.

2. "There shall be, for the purposes of this chapter, a system of public institutions of higher education, hereinafter called the system, which shall include ... the University of Massachusetts.... The board of regents of higher education shall be the governing authority of the system." M.G.L. c. 15A § 3.

3. *Id.*

4. "There shall be a board of trustees for each of the institutions named in section three,.... No member of a board of trustees shall be a member of the board of regents of higher education. No member of the board of trustees shall be principally employed by any public educational institution or school system, or by the commonwealth." M.G.L. c. 15A § 9.

5. This incapacity arises pursuant to a statutory prohibition against any government employee suing the commonwealth. "No state employee shall, otherwise than in the proper discharge of his official duties, act as agent or attorney for anyone other than the commonwealth or a state agency for prosecuting any claim against the commonwealth or a state agency, or as agent or attorney for anyone in connection with any particular matter in which the commonwealth

ters. On October 1, 1975, however, the Board authorized the LSO "to represent students in criminal matters and to engage in litigation against the University on their behalf" for the duration of the then current fiscal year. Nine months later, on June 2, 1976, the Board authorized the LSO to continue indefinitely the extended representation authorized in 1975. The LSO's authority to represent students in criminal matters and in suits against UMass, as granted in the 1976 vote, continued uninterrupted for more than ten years.

During the past two years, the Board has twice acted to remove the added authority it had granted the LSO in 1975 and 1976. The Board's efforts in this direction sparked the instant litigation. On August 6, 1986, the Board rescinded the 1975–76 grants of authority to represent students in criminal matters and in suits against UMass. One year later, on August 31, 1987, the Board rescinded "all prior votes of the Board of Trustees concerning the Legal Services Office," effectively eliminating the LSO altogether.

At the same time the Board abolished the LSO in August of 1987, it created a new entity, the Legal Services Center (the "LSC"). The LSC was granted no authority to represent students in any litigation or to negotiate with the University. The LSC is authorized only to provide students with primary legal advice and legal education.

Plaintiffs filed this action on November 21, 1986, after the Board first rescinded the LSO's authority to represent students in criminal matters and in suits against UMass, but before the Board's subsequent decision to abolish the LSO and to establish the LSC. Defendants, in the motion under

consideration, move for summary judgment on four grounds,[6] one of which asserts that plaintiffs have suffered no constitutional injury.

## II.

In deciding defendants' summary judgment motion, the court must view the evidence presented by the parties in the light most favorable to the non-movant, the plaintiffs here.[7] *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). The resolution of defendants' summary judgment motion hinges on whether plaintiffs suffered a constitutional injury. This inquiry raises two interrelated issues: 1) whether the LSO services constituted a public forum, and 2) whether the Board's decisions with respect to the LSO were content-based.

## III.

### A.

A state government may not restrict access to a public forum without the requisite governmental interest. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567 (1985). The degree of government interest the state must demonstrate depends on the type of forum it is regulating. There are three types of fora: traditional public; limited public; and nonpublic. The more a vehicle for expression resembles a public forum, the greater an interest the government must prove to justify restricted access. *Id.* at 797, 105 S.Ct. at 3446–47.[8]

or a state agency is a party or has a direct and substantial interest." M.G.L. c. 268A § 4(c).

6. First, defendants argue that plaintiffs have suffered no first amendment injury. Second, they say that there can be no conspiracy among them. Third, they claim that no plaintiff has standing to sue. And fourth, they say plaintiffs' claim was mooted by the August 31, 1987 abolition of the LSO.

7. Plaintiffs here have not submitted a statement of facts in dispute. The court, therefore, relies on the material facts set forth in the defendants' statement of facts not in dispute.

8. *See also, Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–55, 74 L.Ed.2d 794 (1983) (for state to enforce a content-based exclusion from a "quintessential" public forum, it must show content-based regulation is necessary to compelling state interest and narrowly tailored to achieve that end; for nontraditional, or limited, public forum, state need not keep forum open indefinitely, but so long as it does, same standard applies; for nonpublic forum, state may "reserve forum for its intended purpose, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to sup-

Conversely, the state may deny access to a nonpublic forum, even if it presents only a reasonable justification, as long as there are alternative means of communication open to the excluded individual. *Connecticut State Federation of Teachers v. Board of Ed. Members*, 538 F.2d 471, 481 (2d Cir.1976).

 In all but traditional public fora, the state may eliminate the forum altogether and, by so doing, legitimately restrict the exercise of speech. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983) ("Although a State is not required to indefinitely retain the open character of the facility, as long as it does so, it is bound by the same standards as apply in a traditional public forum."); *Connecticut State Federation of Teachers, supra*, 538 F.2d at 481 (2d Cir.1976) ("Since the facilities are not ordinarily open to the public, access to them for the purpose of engaging in First Amendment activities may be denied altogether.") (citing *Amalgamated Food Employees v. Logan Valley Plaza*, 391 U.S. 308, 320, 88 S.Ct. 1601, 1609, 20 L.Ed.2d 603 (1968)). In other words, merely because the state provides a limited public forum, it does not have a continuing obligation to keep it open. *Perry Educ. Ass'n, supra*, 460 U.S. at 45–46 n. 7, 103 S.Ct. at 955 n. 7. *See also*, R. ROTUNDA, J. NOWACK, & J. YOUNG, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE, § 20.47 at 249 (1986) (hereinafter ROTUNDA, NOWACK, & YOUNG) ("the government may choose to close the forum to the public and expressive activities; it does not have to keep [a non-traditional public forum] open indefinitely.")

 Here, the threshold inquiry concerns the kind of forum LSO legal services constituted. "A facility is a public forum only if it is designed to provide a general public right of access to its use, or if such public access has historically existed and is not incompatible with the facility's primary activity." *Muir v. Alabama Educational Television Com'n*, 688 F.2d 1033, 1042 (5th Cir.1982), *cert. denied*, 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983). Factors to consider in evaluating whether a facility or forum is public are the government's policy and practice with respect to access to the facility, the nature of the essential purpose of the facility, and its normal use or capability of accommodating expressive activity. *Id.* (quoting *Southeastern Promotions, Ltd. v. City of West Palm Beach*, 457 F.2d 1016 (5th Cir.1972)).

The services LSO provides to UMass students do not constitute a public forum. Traditionally, public fora include sidewalks, parks, and other places where the public, typically or historically, has had access and an expectation that their freedom to speak will be tolerated. *NAACP Legal Defense and Educational Fund, supra*, 473 U.S. at 802, 105 S.Ct. at 3449. The LSO did not meet that test. It was never open to the general public. Rather, LSO services were available only to UMass students who paid a mandatory activities fee.

The LSO, however, may be considered what has become known as a "limited public forum". A non-traditional, or limited, public forum is a government facility, not typically used for expressive activities, but which the government has opened to the public for expressive activities. *Perry Educ. Ass'n, supra*, 460 U.S. at 45, 103 S.Ct. at 955. Here, the University opened the LSO's services to UMass students for expressive activity. Although LSO services were not available to the general public, they were uniformly offered to UMass students.

The students' access to the LSO, however, was restricted in several ways. The LSO's resources were limited. There were, at most, four lawyers working for the LSO at any one time. Presumably, some students would have been denied legal aid, if a large number simultaneously requested LSO services. Further, these services were a benefit that UMass conferred on its students for an undetermined period of time. The University had no obligation to provide them in the first place, and it made

press expression merely because public officials

oppose the speaker's issue.").

no commitment to provide them permanently.

The LSO services, therefore, may fairly be deemed not to have been a public forum in the classic sense.

## B.

■ The key question defendants' summary judgment motion presents is whether the University's actions are a content-based restriction of the students' exercise of First Amendment activities. A regulation is content-based if it "is in fact an attempt to suppress content because of its message." ROTUNDA, NOWACK & YOUNG, § 20.47, at 237. If the state must focus on what a speaker is saying in order to enforce a regulation, then that regulation has violated the First Amendment. *See, e.g., Police Department of the City of Chicago v. Mosely,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) ("The central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter."); *Regan v. Time, Inc.,* 468 U.S. 641, 648, 104 S.Ct. 3262, 3267, 82 L.Ed.2d 487 (1984) ("A determination concerning the newsworthiness or educational value of a photograph cannot help but be based on the content of the photograph and the message it delivers.... Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment."). A content-based regulation infringes upon First Amendment rights because it singles out and prohibits a certain message. A content-neutral regulation of access to a limited public or nonpublic forum, on the other hand, does not violate the First Amendment.

■ Here, the Board's termination of LSO services was content-neutral and, therefore, constitutional. The Board's 1986 decision was to rescind LSO's authority to represent students in criminal matters *and* in suits against UMass. This was not content-based action. To the contrary, it was a non-selective withdrawal of an entire gra-

tuitous grant of authority made in 1975–76. In 1975–76 the Board gave the LSO authority to represent students in two ways—in criminal cases and in suits against the University. In 1986, the Board ended that authority with respect to both types of suits. The Board did not merely eliminate suits against the University. The 1975–76 grants of such authority were not permanent. To hold that the University's subsequent attempt to withdraw such authority was a First Amendment violation would be tantamount to concluding that the Board could never change its mind after granting students a service or a privilege.

■ Plaintiffs question defendants' motive for eliminating the LSO's authority to represent students. But, in the absence of a constitutional injury, defendants' motive is irrelevant. In other words, if the Board's action is content-neutral, even an improper motive will not render it unconstitutional. *See, United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672, *reh'g denied,* 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968) ("It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.")

■ Because it was content-neutral, the Board's action would be constitutionally sound no matter what kind of forum the LSO services provided. As discussed, UMass' grant of LSO services to its students created at most a non-traditional and at least a nonpublic forum. In order to justify limitation of access to a nontraditional forum, UMass must only demonstrate that its action was content-neutral or, if it was content-based, that it was supported by a compelling state interest and narrowly tailored to achieve that interest. *Perry Educ. Ass'n, supra,* 460 U.S. at 45, 103 S.Ct. at 954–55. To limit access to a nonpublic forum, the state must give a reasonable justification and there must exist alternative means of communicating the speakers' message. *Id.*[9]

---

**9.** Even assuming, *arguendo,* that the LSO was a traditional public forum, the Board's actions do

not violate the students' First Amendment rights. At most, the Board took back what it

■ Finally, the students who have lost access to the LSO services have alternative means for litigating their disputes with the University and for obtaining representation in criminal matters. The fact that some of the students are indigent or that alternative services may not be as readily available as LSO services is not a matter of constitutional significance.[10]

### Conclusion

Although the LSO provided a vehicle through which UMass students expressed themselves, it was not a traditional public forum and the University had the right to regulate access to its services and, indeed, eliminate the forum entirely. Here, the rescission of both services, granted together, was content neutral, and did not violate the UMass students' First Amendment rights. Having failed to allege a First Amendment injury, the plaintiffs claims must fall. The defendants' motion for summary judgment is, therefore, granted.[11]

An order will issue.

---

had previously given. As discussed, the Board is free to revoke its own resolutions if done in a content-neutral manner.

**10.** *See Regan v. Taxation With Representation of Washington,* 461 U.S. 540, 549–50 (1983) ("'although government may not place obstacles in the path of a[n individual's] exercise of ... freedom of [speech], it need not relieve those

not of its own creation.'") (quoting *Harris v. McRea,* 448 U.S. 297, 316, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980)).

**11.** Because this court finds that no constitutional injury occurred, there is no need to reach the other issues raised in defendants' summary judgment motion.