The STUDENT GOVERNMENT ASSOCIATION, etc., et al., Plaintiffs, Appellants,

v.

The BOARD OF TRUSTEES OF the UNIVERSITY OF MASSACHUSETTS, et al., Defendants, Appellees.

No. 88–1261.

United States Court of Appeals, First Circuit.

Heard Sept. 14, 1988.

Decided Feb. 21, 1989.

As Amended Feb. 27, 1989.

**474**

Richard W. Cole with whom Laurie A. Morin and Stahlin and Bergstresser, Inc., Boston, Mass., were on brief, for appellants.

Marjorie Heins, Massachusetts Civ. Liberties Union Foundation, Anita S. Lichtblau, Michael D. Weisman, and Hill & Barlow, Boston, Mass., on brief, for the Civil Liberties Union of Massachusetts and the Nat. Lawyers Guild, amici curiae.

Peter B. Ellis with whom Joseph D. Halpern, Boston, Mass., Mark S. Masling, Cambridge, Mass., Foley, Hoag & Eliot and William E. Searson, III, University General Counsel, Boston, Mass., were on brief, for appellees.

---

* Of the Southern District of Florida, sitting by

Before TORRUELLA and SELYA, Circuit Judges, and ATKINS,* Senior District Judge.

TORRUELLA, Circuit Judge.

The plaintiffs, three students at the University of Massachusetts and three student organizations, sued the University's Board of Trustees and four University officials seeking declaratory and injunctive relief. The crux of the complaint was that the defendants conspired to violate the plaintiffs' First Amendment rights to speak and associate freely and to petition the government with grievances by abolishing the University's Legal Services Office. The plaintiffs appeal Judge Tauro's order granting the defendants' motion for summary judgment. *See Student Government Association v. Board of Trustees,* 676 F.Supp. 384 (D.Mass.1987). We affirm.

The University of Massachusetts (UMass or the University) is part of the Massachusetts system of public institutions of higher education. *See* Mass.Ann.Laws ch. 75, § 1 (Law.Coop.1978). The University is governed by its Board of Trustees (the Board). *See id.* ch. 15A, § 9 (1988). In 1974, the Board established the Legal Services Office (LSO) as an administrative unit of the University. Massachusetts law prohibits any state employee from representing a private party with respect to any claim against the Commonwealth or a state agency "otherwise than in the proper discharge of [that employee's] official duties." *See id.* ch. 268A, § 4(c) (1980). The LSO's attorneys had no inherent authority to represent students in criminal matters or in civil suits against the University. On October 1, 1975, however, the Board authorized the LSO to represent students in criminal matters and to engage in litigation against the University on their behalf for the remainder of the fiscal year. On June 2, 1976, this authorization was extended indefinitely.

The LSO was staffed by attorneys, students, and various administrative and clerical staff. It represented both students and

designation.

student organizations and was involved in educational activities involving students. The LSO was almost exclusively financed by mandatory graduate and undergraduate student activity fees. The LSO was also supported indirectly from University funds by UMass' provision of free electricity, heat, and office space for the LSO office on the UMass campus.

On August 6, 1986, the Board of Trustees rescinded the LSO's authorization to represent students in criminal matters and in suits against UMass and its employees (the 1986 order). On August 31, 1987, the Trustees abolished the LSO by rescinding all previous Board votes concerning the LSO (including, but not limited to, the 1986 vote at issue in this action) (the 1987 order). The LSO was replaced by the Legal Services Center (LSC), which was prohibited from engaging in *any* litigation, and whose sole purpose was to provide primary legal advice to individual students and to educate students as to their legal rights.

The plaintiffs filed this action on November 21, 1986—after the 1986 order but before the LSO was abolished. They claimed that this order was motivated by the LSO's success in suits against the University and its officials and was intended to deter students' ability to bring such suits in the future. The plaintiffs substantiated these claims by reference to statements by University officials expressing fear about the threat of being sued personally by the LSO on behalf of students. The plaintiffs also claimed that the Trustees' action jeopardizes the employment rights of LSO employees who disobey the Board's 1986 order, and deprives students and student organizations of representation. The complaint was subsequently amended to encompass the 1987 order.

■ The defendants requested summary judgment on four grounds: (a) that the complaint did not state a First Amendment violation, (b) that there can be no conspiracy amongst them, (c) that plaintiffs lack standing, and (d) that plaintiffs' claims were in any case mooted by the August 31, 1987 abolition of the LSO. Judge Tauro found that there was no First Amendment

violation because the 1986 decision was "a nonselective withdrawal of an entire gratuitous grant of authority made in 1975–76." 676 F.Supp. at 388. The court also ruled that the Trustees' termination of LSO's services was "content-neutral" and therefore constitutional. *Id.* Furthermore, he held that in the absence of a constitutional injury, the Trustees' motive was irrelevant. *Id.* Although Judge Tauro had determined that the LSO was a limited public forum, *see id.* at 387, he decided that the content-neutrality of the Board's action made irrelevant the issue of what type of forum the LSO represented. Because Judge Tauro granted summary judgment on the first ground, he did not consider the other three grounds advanced by the defendants.

*First.* The initial issue we need to address is mootness. Judge Tauro's opinion focuses on the 1986 order and holds that it does not violate the First Amendment rights of the plaintiffs. Because the Board's 1987 order rescinded the 1986 order, the subsequent order would ordinarily lead us to dismiss this case, in which plaintiffs seek only declaratory and injunctive relief, for lack of a real dispute between the parties. *See Pallazola v. Rucker,* 797 F.2d 1116, 1128 (1st Cir.1986); *Boston Teacher's Union, Local 66 v. Edgar,* 787 F.2d 12, 15–19 (1st Cir.1986). Despite the fact that the dispute over the 1986 order is moot, we decline to dismiss this suit because there is a genuine dispute, properly before us, with regard to the 1987 order.

On September 14, 1987, Judge Tauro allowed the plaintiffs to amend their complaint to seek redress for the August 31, 1987 order. This complaint, containing virtually identical objections to both orders, was the operative complaint in the case on December 4, 1987 when Judge Tauro entered summary judgment for the defendants. Thus, his opinion, although focusing on the 1986 order, also encompasses the 1987 order, to which he explicitly refers. *See* 676 F.Supp. at 386. Although Judge Tauro could have focused exclusively on the 1987 order, we agree with defendants' counsel that Judge Tauro probably addressed the 1986 order because it was

the plaintiffs' "best case." Even if this reconstruction is incorrect, we conclude that a remand is unnecessary because Judge Tauro's decision with respect to the 1986 order grants summary judgment a fortiori to the defendants with respect to the 1987 order.

■ *Second.* We now turn to the merits, focusing exclusively on the 1987 order. The plaintiffs concur in Judge Tauro's conclusion that the LSO is a limited public forum, and argue that this case is therefore controlled by *Cornelius v. NAACP Legal Defense & Educational Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). In that case, the NAACP and other political advocacy organizations sought to participate in the Combined Federal Campaign, a charity drive aimed at federal employees. The Court held that "[t]he existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination." *Id.* at 811, 105 S.Ct. at 3453. Accordingly, despite having determined that the regulation excluding political advocacy organizations was reasonable, the *Cornelius* Court remanded to allow the plaintiffs to pursue their claim that this facially valid government regulation was in fact based on a desire to suppress a particular point of view. The plaintiffs in this case argue that if the Court was willing to inquire into the state's motive in the context of a nonpublic forum, it necessarily follows that such an inquiry is required in the context of a regulation affecting the LSO, which they claim is a limited public forum. They therefore urge us to reverse the order granting defendants summary judgment and to remand the case for trial on the issue of improper motive.

The problem with the plaintiffs' syllogism is its premise. Forum analysis is inappropriate in this case because the LSO is not a forum for purposes of the First Amendment. Although fora have traditionally had a physical situs, *see Hague v.*

*CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939) (parks and streets); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal theater); *Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (fairgrounds), the Supreme Court has recently extended the concept of a forum to include intangible channels of communication, *see Cornelius, supra* (charitable fundraising drive conducted in government workplace); *Perry Education Association v. Perry Local Educator's Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (school's internal mail system). But even under this expanded view, we fail to see how the LSO is a forum. Since fora are channels of communication, we begin our analysis by identifying the two groups of people with whom the students are communicating: first, the persons with whom they have legal disagreements; second, the LSO's attorneys.

As regards the communication between the students and those against whom they have filed lawsuits, the channel of communication is the court system.[1] The LSO attorneys help the students to participate in this forum. That the LSO and its attorneys are not themselves a forum for purposes of this communication is demonstrated by this very lawsuit. In the absence of the LSO, the students continue to use the same channel of communication (the court system) to address those with whom they have legal disagreements. The LSO merely represents an in-kind speech subsidy granted by UMass to students who use the court system. This conclusion can be reinforced by analogizing this case to *Cornelius.* A proper comparison requires the following adjustment to the facts of that case: assume that the government hired a group of advertising experts and made them available to polish the messages of the groups that wished to participate in the Combined Federal Campaign (CFC). Those advertising experts and the program under which they are made available do not repre-

---

1. The defendants do not dispute the plaintiffs' contention that their right to litigate in order to seek redress for grievances is fully protected by the First Amendment. *See NAACP v. Button,* 371 U.S. 415, 429–31, 83 S.Ct. 328, 335–37, 9 L.Ed.2d 405 (1963).

sent a forum for purposes of the communication between charitable organizations and government employees because regardless of whether the government provides the advertising experts, the charitable groups can continue to communicate with government employees through the CFC. Like the LSO, the program making advertising experts available to charities represents an independent in-kind subsidy of private speech.

We now turn to the communication between the students and the LSO attorneys. At first glance, this communication fits the *Cornelius* and *Perry* model: it features private persons seeking to communicate with government employees. The nature of the communication in this case, however, is qualitatively different from that in *Cornelius* and *Perry*. The students do not seek contributions from government employees in their personal capacity, as in *Cornelius*, or the union allegiance of government employees, as in *Perry*; instead, the students seek the services of government employees acting in their official capacities. It is true that for purposes of this "communication," the LSO program is a "channel of communication." To use these terms in this manner, however, would greatly expand the scope of forum analysis. *Cf.* Benshoof, *The Chastity Act: Government Manipulation of Abortion Information and the First Amendment,* 101 Harv.L.Rev. 1916, 1932 (1988) (recognizing that government benefit programs do not fit within the definition of public fora); Schmedemann, *Of Meetings and Mailboxes: The First Amendment and Exclusive Representation in Public Sector Labor Relations,* 72 Va.L.Rev. 91, 115 (1986) (noting difficulty in categorizing systems of communication as public or nonpublic fora). Forum doctrine was developed to monitor government regulation of access to publicly-owned real property for speech purposes. *See* Cass, *First Amendment Access to Government Facilities,* 65 Va.L.Rev. 1287, 1287 (1979); Stone, *Fora Americana: Speech in Public Places,* 1974 Sup.Ct.Rev. 233, 239–56. It focuses on the government in its role as a regulator in the marketplace of ideas. Without a more specific mandate from the Supreme Court, we are reluctant to extend the forum doctrine's regulatory tradition of "absolute neutrality," *Advocates for the Arts v. Thomson,* 532 F.2d 792, 796 (1st Cir.), *cert. denied,* 429 U.S. 894, 97 S.Ct. 254, 50 L.Ed.2d 177 (1976), *accord Bonner–Lyons v. School Committee,* 480 F.2d 442, 444 (1st Cir.1973), to this instance in which Massachusetts participates as a player in the marketplace of ideas, using its subsidies rather than its regulations. *See Block v. Meese,* 793 F.2d 1303, 1314 (D.C.Cir.) (Scalia, J.) (stating that the First Amendment does not require the government to be ideologically neutral), *cert. denied,* 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986); *see also* Tribe, *Toward a Metatheory of the First Amendment,* 10 Sw.U.L. Rev. 237, 244 (1978) (stating that a First Amendment theory should distinguish between government as a censor and government as a speaker). Consequently, we hold that the LSO is not a forum for purposes of the First Amendment, and that forum analysis is therefore inapplicable.

■ *Third.* We think this dispute is governed by the Court's subsidy cases. *See Lyng v. International Union,* 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988); *F.C.C. v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984); *Regan v. Taxation with Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Cammarano v. United States,* 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959). As even the plaintiffs' attorney conceded at oral argument, the University has not tried to restrict the First Amendment rights of the students; all it has sought to do is to stop subsidizing the exercise of those rights. The plaintiffs nevertheless argue that this is not a subsidy case for three reasons. First, the Board did not reduce or eliminate funding for the LSO/LSC, and there was no evidence in the record that funding was an issue in the Board's decision. Second, none of the subsidy cases involved a find-

ing of specific retaliatory intent. Third, the LSO was almost exclusively financed, not by state monies, but by student funds collected in the form of mandatory student activity fees.

We are unpersuaded. The first reason seems illogical. A state entity does not have to change the amount of its overall subsidy to an organization to terminate its subsidization of any specific activity pursued by that organization. In this case, UMass ended its subsidization of the LSO/LSC's litigation activities and used the freed-up funds to subsidize non-litigation activities. The second reason puts the cart before the horse. This dispute does not fall out of the subsidy framework because the state may have been improperly motivated. Instead, once it is determined that this dispute falls within the subsidy rubric, the next issue, which we address later, is the relevance of the state's motive.

■ The third reason is incorrect as a matter of law. Student activity fees do not "belong" to students.[2] They are collected by UMass under authority of state law. *See* Mass.Ann.Laws ch. 15A, § 10 (Law. Coop.1988). Payment of fees is voluntary only in the sense that one may choose not to enroll; apart from that, payment is a contractual condition of enrollment as a resident student. *See* Joint Appendix at 100. Those fees are placed in the Student Activity Trust Fund. *See id.* That Fund is administered by UMass officers, *see id.*,

subject to the direction of the Board of Trustees, who are authorized by statute to determine how the fees are to be spent. *See* Mass.Ann.Laws ch. 15A, § 10 (Law. Coop.1988); *cf. Maryland Public Interest Research Group v. Elkins*, 565 F.2d 864, 867 (4th Cir.1977) (stating that employment of mandatory student fees is primarily a determination for the Board of Trustees), *cert. denied*, 435 U.S. 1008, 98 S.Ct. 1879, 56 L.Ed.2d 390 (1978); *Arrington v. Taylor*, 380 F.Supp. 1348, 1364 (M.D.N.C.1974) (describing University's allocation of mandatory student fees to fund a student newspaper as a governmental subsidy of a forum), *aff'd mem.* 526 F.2d 587 (4th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1111, 47 L.Ed.2d 317 (1976). The plaintiffs appear to rely on Mass.Ann.Laws ch. 75, § 11 (Law.Coop.1978) for the proposition that the student activity fees belong to the students. That statutory provision authorizes the Board to establish and manage trust funds for, *inter alia*, revenues generated by student activities such as dramatics and athletics. These trust funds are to be expended "as the [Board of] trustees direct in furthering the activities from which the receipts were derived." We fail to understand how this statute applies to the mandatory student activity fees that are specifically authorized by ch. 15A, § 10, and even if it does, how it establishes that such fees belong to students. Moreover, the plaintiffs cite no cases supporting their interpretation of the statute.[3]

---

**2.** The plaintiffs also make a substantive due process claim based on UMass' use of the student activity fees. They argue that those fees belong to the students, and that the UMass Board has been placed in a fiduciary role with respect to those fees. In deciding to discontinue using those funds to subsidize LSO's litigation activities, the Board acted in its own interest and contrary to the interests of the beneficiaries of those fees (the students), thus breaching a fiduciary duty. Because those fees represent a property interest protected by the Constitution's due process clause, and because the Board acted in an arbitrary and capricious manner, the students allege that their substantive due process rights were violated. Because the district court failed to review this claim, the plaintiffs urge us either to determine this claim *de novo* or to remand it to the district court for determination. We see no need to remand because this claim is completely frivolous. Even if we as-

sume that money collected from student activity fees belongs to the students, the plaintiffs fail to explain how a breach of fiduciary duty claim can be transformed into a constitutional violation, and a violation of substantive due process at that.

**3.** There are many cases in which students have challenged a University's decision to use mandatory student activity fees to fund organizations whose ideas they find repugnant. *See* Comment, *Mandatory Student Fees: First Amendment Concerns and University Discretion*, 55 U.Chi.L.Rev. 363, 364 & n. 6 (1988) (citing cases). These challenges, which have almost uniformly been rejected, *see id.* at 371, are based on the First Amendment right not to associate with a particular idea, *see id.* at 364. If anything, these cases suggest that to the extent that the subsidized litigation was only incidentally related to education, a student may have been

■ The basic lesson to be drawn from the Court's subsidy cases is that although the government may not place obstacles in the path of the exercise of constitutionally protected activity, it need not remove obstacles not of its own creation. *See McRae,* 448 U.S. at 316, 100 S.Ct. at 2687. Consequently, the state does not violate an individual's First Amendment rights if it refuses to subsidize those activities of that individual that are protected by the First Amendment. *See Regan,* 461 U.S. at 545–46, 103 S.Ct. at 2000–01; *Cammarano,* 358 U.S. at 513, 79 S.Ct. at 533. The Supreme Court has identified at least two caveats, however. First, the state may not deny an individual any independent benefit on account of his decision to exercise his First Amendment rights. *See FCC,* 468 U.S. at 399–401, 104 S.Ct. at 3127–28; *Regan,* 461 U.S. at 544, 103 S.Ct. at 2000; *id.* at 552–54, 103 S.Ct. at 2004–05. (Blackmun, J., concurring); *McRae,* 448 U.S. at 317 n. 19, 100 S.Ct. at 2688 n. 19; *Roe,* 432 U.S. at 474 n. 8, 97 S.Ct. at 2382 n. 8; *Speiser v. Randall,* 357 U.S. 513, 518–19, 78 S.Ct. 1332, 1338, 2 L.Ed.2d 1460 (1958). Second, from an equal protection perspective, the state must not "discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.'" *Regan,* 461 U.S. at 548, 103 S.Ct. at 2002 (quoting *Cammarano,* 358 U.S. at 513, 79 S.Ct. at 533).

We now apply these principles to this case. First, UMass has refused to pay for the litigation expenses of its students, but there is no indication that UMass is penalizing any student for engaging in litigation. "A refusal to fund protected activity, without more, cannot be equated with the imposition of a penalty." *McRae,* 448 U.S. at 317 n. 19, 100 S.Ct. at 2688 n. 19. Students who engage in litigation—even those who are engaged in litigation against the University—are not precluded from taking advantage of the LSC's services, nor are such students denied any independent benefit on account of their litigation activity. The second caveat is inapplicable because the plaintiffs have not made an equal protection claim. We note, however, that the withdrawal of the subsidy is not framed in an invidiously discriminatory manner that is designed to suppress dangerous ideas. The 1987 order applies to *all* litigation (although litigation initiated at the time of the 1986 order is grandfathered), not just litigation advocating liberal or conservative causes. *Cf.* Comment, *supra,* 55 U.Chi.L. Rev. at 394–95 (stating that university decision not to fund *any* political groups, even though it is based upon the content of a group's speech, is not unconstitutional because "it excludes *all* political groups, not just those with a particular viewpoint") (emphasis in original). Nor is there any indication that the Board's 1987 order was aimed at the suppression [4] of student suits

---

able to compel UMass to discontinue using activity fees to finance ideological litigation that was repugnant to her. *See* Steele, *Mandatory Student Fees at Public Universities: Bringing the First Amendment within the Campus Gate,* 13 J.C. & U.Law 353, 370 (1987).

In any event, this case is unique in that the plaintiffs seek to compel the University to continue providing free litigation services. We believe this claim, which involves a nonselective withdrawal of funding, is governed by the Court's subsidy cases. *Cf.* Comment, *supra,* 55 U.Chi.L.Rev. at 382–88 (stating, even in the different context of deciding whether a university must fund all student groups from mandatory student activity fees, that one must consider both the public forum cases as well as the subsidy cases).

**4.** *Regan* did not specify whether "suppression" of an idea meant (a) a mere reduction in the frequency with which that idea is disseminated,

or (b) a more restrictive effect raising a reasonable danger that the idea will be "drowned out." We find the former interpretation implausible because it would handcuff government expenditures. A decision not to subsidize or to withdraw subsidization of a viewpoint is generally based on an assessment of that viewpoint. Furthermore, the withholding of a subsidy will ordinarily cause a given viewpoint to be articulated less frequently than it would be with the subsidy. Thus, under the latter interpretation, a state that decides to withdraw a speech subsidy because it is being used to advance viewpoints that the state does not support would be aiming to "suppress" that viewpoint. Under this interpretation, the state would presumably be unable to discontinue a subsidy that was used to urge the decriminalization of narcotics, or to advocate racism or sexism. We prefer the second interpretation, although we recognize that the standard it establishes will necessarily vary with the facts of each case.

against either third parties or the University.[5] And even the plaintiffs do not claim that the order will have such an effect.

*Fourth.* The plaintiffs insist that the analysis cannot end here; the First Amendment requires an inquiry into UMass' motive. They argue that the 1987 order would violate the First Amendment if it was entered in response to the content of the LSO's speech. They concede that UMass can withdraw its litigation subsidy for a variety of legitimate reasons, but insist that dissatisfaction with the volume of lawsuits brought against UMass and its officials by the LSO is not such a reason. To support their position, plaintiffs cite a plethora of cases. The most favorable of these cases can be divided into three categories: delegated editorial authority cases, government contract cases, and abortion funding cases.

■ The first category of cases illustrates the delegated editorial authority doctrine. *See* M. Yudof, *When Government Speaks* 243–44 (1983); Cass, *The First Amendment and the State as Editor: Implications for Public Broadcasting*, 52 Tex.L.Rev. 1123, 1135 (1974). Having delegated discretionary editorial functions to a subordinate body, the state is not permitted to revoke that delegation merely because it objects to the content of any specific decision clearly within the editorial authority of the subordinate body. *See, e.g., Board of Education v. Pico*, 457 U.S. 853, 872, 102 S.Ct. 2799, 2810, 73 L.Ed.2d 435 (1982) (plurality opinion) (holding that local school boards may not remove books from high school library shelves "simply because they dislike the ideas contained in those books"); *Joyner v. Whiting*, 477 F.2d 456, 460 (4th Cir.1973) (holding that a University has no

obligation to establish a student newspaper, but that if it does, it may discontinue publication of that newspaper only for reasons other than dissatisfaction with its editorial content); *see also Stanley v. Magrath*, 719 F.2d 279, 282, 283 n. 6 (8th Cir.1983) (student newspaper case involving less severe sanctions than discontinuation); *Antonelli v. Hammond*, 308 F.Supp. 1329, 1336–38 (D.Mass.1970) (same). These cases are inapposite because they involve channels of communication (student newspapers,[6] school libraries) to which forum analysis is applicable. Once the state has created a forum, it may not condition access to the forum on the content of the message to be communicated, or close the forum solely because it disagrees with the messages being communicated in it. *See* L. Tribe, *American Constitutional Law* § 12–24 (2d ed. 1988). As we have explained, the LSO is not a channel of communication and forum analysis is therefore inapplicable.

■ Our approach distinguishes sharply between forum analysis and subsidy analysis. We recognize that there is some overlap between the two doctrines because in maintaining forums, the state indirectly subsidizes private speech. *See* J. Tussman, *Government and the Mind* 99 (1977); M. Yudof, *supra*, at 234 & n. 2. Despite the fact that subsidies are involved in both instances, the state's freedom in discontinuing subsidization of a forum is more restricted than its freedom in discontinuing subsidization of private speech. We think this difference is entirely appropriate because the state is acting as a regulator in the former context, and as a speaker in the latter context.[7] *See* Tribe, *supra*, 10 Sw.U.

---

**5.** UMass continues to subsidize the LSC, whose purpose is to provide primary legal advice to students and to educate them as to their legal rights.

**6.** *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), in which the Court held that a high school newspaper whose production was part of educational curriculum was not a public forum, is not applicable to college newspapers. *See id.* 108 S.Ct. at 571 n. 7.

**7.** It will not always be easy to determine when the state is acting as a regulator and when it is acting as a speaker. Even in hard cases, however, we are confident that courts will draw, as they have always drawn, the necessary doctrinal boundaries. *Cf.* Post, *Between Governance and Management: The History and Theory of the Public Forum*, 34 UCLA L.Rev. 1713 (1987) (arguing for a reformulation of forum analysis that would focus on whether the government is exercising governance or managerial authority).

L.Rev. at 244. The state's actions as a regulator are subject to a standard of "absolute neutrality," but there is no similar tradition with respect to public subsidization of speech. *Advocates for the Arts,* 532 F.2d at 796; *cf.* Post, *supra,* 34 UCLA L.Rev. at 1782–84 (stating that normal First Amendment standards should be applied when the state is exercising governance authority, but that the state enjoys more discretion when it exercises managerial authority).

The government contract cases stand for the proposition that the state may not refuse to renew legal services contracts with private organizations solely because those organizations file lawsuits against the state. *See Westchester Legal Services, Inc. v. Westchester County,* 607 F.Supp. 1379, 1382 (S.D.N.Y.1985); *Northern Pennsylvania Legal Services, Inc. v. County of Lackawanna,* 513 F.Supp. 678, 684 (M.D.Pa.1981).[8] These cases are not on point because they involve direct state penalties on constitutionally protected speech. *See Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Speiser,* 357 U.S. at 518–19, 78 S.Ct. at 1338. They would have been more analogous if the state had specified that grantees could not use state funds to finance suits against the state, but allowed grantees to use private funds for that purpose. In addition to this difference, the government contract cases are also inapposite because they involve independent private organizations, whereas the LSO is an administrative unit of the University. The LSO, a state entity, itself has no First Amendment rights, although the private legal service clinics in the government contract cases clearly did. The students in this case are analogous to the legal service clinics in those cases. UMass' 1987 order would probably be unconstitutional if UMass penalized students who had in good faith engaged in nonfrivolous litigation by prohibiting them from taking advantage of the LSC's services for other legal problems.

The abortion funding cases stand for the proposition that the state cannot refuse to make grants to an organization that encourages or performs abortions if those abortion-related services are performed with funds derived from nongovernmental sources. *See Planned Parenthood of Central and Northern Arizona v. Arizona,* 789 F.2d 1348, 1350–51 (9th Cir.), *aff'd without opinion sub nom. Babbitt v. Planned Parenthood,* 479 U.S. 925, 107 S.Ct. 391, 93 L.Ed.2d 346 (1986); *Planned Parenthood Association Chicago Area v. Kempiners,* 568 F.Supp. 1490, 1495 (N.D. Ill.1983); *Valley Family Planning v. North Dakota,* 489 F.Supp. 238, 242–43 (D.N.Dak.1980), *aff'd on other grounds,* 661 F.2d 99 (8th Cir.1981).[9] These cases do not support the plaintiffs' position; UMass has not sought to deprive the plaintiffs of any independent benefits if they engage in litigation using private funds. If anything, the abortion funding cases undercut the plaintiffs' position—they permit a state to discontinue funding abortion-related services even though the state's decision, based on a value choice favoring childbirth over abortion, is made in response to the content of the grantee's first amendment protected speech and conduct. *See, e.g., Planned Parenthood of Central and Northern Arizona v. Arizona,* 718 F.2d 938, 942–44 (9th Cir.1983); *cf.* Hirt, *Why the Government is Not Required to Subsidize Abortion Counseling and Referral,* 101 Harv.L.Rev.

---

8. *Frissell v. Rizzo,* 597 F.2d 840, 845 (3d Cir.), *cert. denied,* 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed. 2d 54 (1979), in which the court suggested that withdrawal of city advertising in response to a newspaper's unfavorable reporting would violate the newspaper's First Amendment rights, and *Mission Trace Investments, Ltd. v. Small Business Administration,* 622 F.Supp. 687 (D.Colo.1985), in which the court invalidated an SBA rule barring financial assistance to all applicants engaged in the creation and dissemination of ideas and values, are analogous.

9. The plaintiffs also cite *Massachusetts v. Bowen,* 679 F.Supp. 137, 145, 147 (D.Mass.1988), which stands for the broader proposition that facially content-based refusals to subsidize private speech violate the First Amendment. This decision is currently on appeal before this court (Docket No. 88–1279, argued on July 28, 1988). In any event, UMass' 1987 order is not facially content-based because it applies to all litigation.

1895, 1899 (1988) ("*Maher* and *Roe* reaffirm the government's right to conduct its programs so as to favor childbirth over abortion ... even though those actions, in practical effect, can be expected to lead to fewer abortions.").

We find no compelling support in the case law for the plaintiffs' proposed rule. In addition, we regard it as unwise from a policy perspective. It would allow the state to discontinue subsidizing speech with which it disagrees only for reasons unconnected with the content of that speech. We find this rule unduly restricts the state's ability to control its speech.[10] *See* Hirt, *supra*, 101 Harv.L.Rev. at 1906–09, 1912. In addition to its role as a regulator, the state plays an important role as a participant in the marketplace of ideas. *See* J. Tussman, *supra*, at 110–15; M. Yudof, *supra*, at 38–42; Shiffrin, *supra*, 27 UCLA L.Rev. at 606. It can speak directly, encouraging certain activities (environmental conservation, for example) while discouraging others (narcotics and smoking, for example). It can also speak indirectly, by subsidizing certain speech (for example, public school teaching) and refusing to subsidize other speech (for example, lobbying). There is no question that unfettered government speech can be dangerous to our democratic society. "The power to teach, inform, and lead is also the power to indoctrinate, distort judgment, and perpetuate the current regime." M. Yudof, *supra*, at 42; *accord* Shiffrin, *supra*, 27 UCLA L.Rev. at 606; *see Advocates for the Arts*, 532 F.2d at 798 & n. 8. With respect to the government's indirect speech in particular, it is important to monitor the government's "undoubtedly broad power" to decide which activities to subsidize, to ensure that the exercise of that power does not penalize citizens who disagree with the government. L. Tribe, *supra*, § 11–5, at 781. As we have explained, this case does not

present those dangers.[11] The plaintiffs here are "simply being required to pay for [their litigation expenses] entirely out of their own pockets." *Cammarano*, 358 U.S. at 513, 79 S.Ct. at 533. Even if the 1987 order withdrawing UMass' in-kind subsidy of student litigation was entered solely in response to LSO's suits against UMass and its officers, we hold that it does not violate the First Amendment because it is nonselective, does not penalize students who engage in litigation, and will not result in the suppression of student litigation. Accordingly, the district court's order granting summary judgment to the defendants is affirmed.

---

**10.** We do not imply that government speech is protected by the First Amendment. *See* M. Yudof, *supra*, at 42–50; *cf. Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94, 139, 93 S.Ct. 2080, 2104, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring) ("The First Amendment protects the press *from* governmental interference; it confers no analogous protec-

tion *on* the government.") (emphasis in original) (footnote omitted).

**11.** A much more difficult situation would be presented if the state's refusal to subsidize could not be implemented without penalizing a grantee's exercise of constitutional rights. *See* L. Tribe, *supra*, § 11–5, at 783–84.