United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 12, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-10998
_____

DANIEL CHIRAS, Individually; ET AL,

Plaintiffs,

DANIEL CHIRAS, Individually; and CONSUELO RODRIGUEZ as Next
Friend of Rocio Rodriguez, Individually and on Behalf of
Others Similarly Situated,

Plaintiffs-Appellants,

v.

GERALDINE MILLER, in Her Official Capacity as Chair of the State
Board of Education; DAVID BRADLEY, in His Official Capacity as a
Member of the State Board of Education and in His Individual
Capacity; DON McLEROY, in His Official Capacity as a Member of
the State Board of Education and in His Individual Capacity; DAN
MONTGOMERY, in His Official Capacity as a Member of the State
Board of Education; CYNTHIA THORNTON; in Her Official Capacity as
a Member of the State Board of Education and in Her Individual
Capacity; and GRACE SHORE, in Her Individual Capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
For the Northern District of Texas
_____

Before KING, Chief Judge, DAVIS, Circuit Judge, and FITZWATER,
District Judge.[1]

_____

[1] District Judge of the Northern District of Texas, sitting by
designation.

1

W. EUGENE DAVIS, Circuit Judge:

Appellants Chiras, a textbook author, and Rodriguez, a high school student, challenge the district court's Rule 12(b)(6) dismissal of their action alleging that the Texas State Board of Education violated the Free Speech Clause of the First Amendment when it refused to approve Chiras' environmental science textbook for state funding. Because we find that the Appellants do not state a violation of the First Amendment, we affirm the district court's dismissal of their suit.

I.

A.

The Texas State Board of Education (the "SBOE" or "Board") is a body created by the state legislature[2] and given a wide degree of authority over education policy in Texas, including the authority to "develop and update a long range plan for public education,"[3] "establish curriculum and graduation requirements,"[4] and "adopt and purchase or license textbooks as provided by Chapter 31 [of the Texas Education Code] and adopt rules required

_____

[2] The Texas Constitution requires that the state legislature create a State Board of Education, but specifies only that "the board shall perform such duties as may be prescribed by law." TEX. CONST., art. 7, § 8.

[3] TEX. EDUC. CODE § 7.102(c)(1) (Vernon 1996).

[4] Id. § 7.102(c)(4)

2

by that Chapter."[5]  The Board is composed of fifteen members elected from districts across Texas in biennial general elections.[6]

The SBOE reviews and adopts the textbooks it deems appropriate for each course.[7]  For each subject and grade level, the State Board of Education is required to adopt two lists of textbooks: one list includes "conforming" textbooks, the other includes "nonconforming" textbooks.[8]  Conforming textbooks contain material covering each element of the essential knowledge and skills of the subject and grade level as determined by the Board, while nonconforming textbooks contain material covering at least half, but not all, of those elements.[9]  Both conforming and nonconforming textbooks must be free from errors and meet the physical requirements adopted by the Board.[10]  The Board accepts or rejects each textbook proposed for placement on one of the two lists by a majority vote.[11]

The review process for a textbook begins with submission of the textbook by the publisher.  The textbook is examined by a

---

[5] Id. § 7.102(c)(23)
[6] Id. § 7.101
[7] Id. § 31.022
[8] Id. § 31.023
[9] Id.
[10] Id.
[11] Id. § 31.024.

review panel, which evaluates the textbook according to criteria promulgated by the SBOE, and submits its evaluation to the Texas Education Agency Commissioner.[12] Based on the opinion of the review panel, the Commissioner then prepares a recommendation to the Board that the textbook under consideration be placed on the conforming list, placed on the nonconforming list, or rejected.[13]

The Board then solicits commentary from the public on the textbook, both in written form and in hearings.[14] Finally, the Board votes on each textbook to either place the book on the conforming or nonconforming list, or to reject the book.[15]

The SBOE has established four conditions under which a textbook can be rejected. Specifically, the Board may reject any textbook for:

(1) failure to meet essential knowledge and skills specified in the proclamation. In determining the percentage of elements of the essential knowledge and skill covered by instructional materials, each performance description shall count as an independent element of the essential knowledge and skills of the subject;

(2) failure to meet established manufacturing standards and specifications recognized by the SBOE;

(3) failure to correct errors of fact; or

---

[12] 19 Tex. Admin. Code § 66.36 (West 1996).
[13] Id. § 66.63.
[14] Id. § 66.60.
[15] Id. § 66.66.

(4) content that clearly conflicts with the stated purpose of the Texas Education Code, § 28.002(h).[16]

Section 28.002(h) of the Texas Education Code in turn provides:

> The State Board of Education and each school district shall foster the continuation of the tradition of teaching United States and Texas history and the free enterprise system in regular subject matter and in reading courses and in the adoption of textbooks. A primary purpose of the public school curriculum is to prepare thoughtful, active citizens who understand the importance of patriotism and can function productively in a free enterprise society with appreciation for the basic democratic values of our state and national heritage.[17]

Each year, once the SBOE formulates its lists of conforming and nonconforming textbooks, the lists are circulated to individual school districts.[18] School districts are required to select textbooks for use in "foundation curriculum" subjects from either the conforming or nonconforming list.[19] School districts may select a book not on either list, however, for use in "enrichment curriculum" subjects.[20] If a school district selects a textbook from the conforming or nonconforming list, the SBOE pays the cost of supplying copies of the textbook, subject to certain limitations.[21] If, however, a school district selects a textbook not on either of the lists adopted by the

---

[16] Id.
[17] TEX. EDUC. CODE § 28.002(h) (Vernon 1996).
[18] Id. § 31.024.
[19] Id. § 31.101(a)(1).
[20] Id. § 31.101(a)(2).
[21] Id. § 31.021; 31.025.

Board, the Board pays only 70% of the cost of the textbooks,[22] and the local school district is responsible for the remainder.[23] School districts may also seek a waiver from the Texas Education Agency Commissioner to obtain full state funding for a rejected textbook.[24]

B.

In May of 1999, the SBOE solicited bids from publishers for textbooks to be used in regular and advanced environmental science classes in Texas public high school. In response, Jones and Bartlett Publishers submitted the sixth edition of ENVIRONMENTAL SCIENCE: CREATING A SUSTAINABLE FUTURE, authored by Appellant Daniel Chiras.

In accordance with the Board's administrative regulations, Chiras' book was submitted to a review panel composed of professors at Texas A&M University. The review panel initially identified some potential factual errors in Chiras' book, and so notified the Commissioner in its initial report. Jones & Bartlett agreed to make corrections to some statements identified by the review panel, and provided justification for others. The review panel accepted Jones & Bartlett's revisions and reported

---

[22] Id. § 31.101(b).
[23] Id. § 31.101(c).
[24] Id. §§ 7.056(a), 31.106.

to the Commissioner that no additional corrections were necessary. The Commissioner then placed ENVIRONMENTAL SCIENCE on the proposed list of nonconforming textbooks to be submitted for public comment. After reviewing the public comments and Jones & Bartlett's responses, the Commissioner recommended in his final report issued on October 26, 2001, that the SBOE adopt Chiras' book. ENVIRONMENTAL SCIENCE was one of only three textbooks recommended for use in regular environmental science courses, and the only textbook recommended for advanced courses.

Appellants allege that after the Commissioner issued his report, two "conservative think-tank organizations"—the Texas Public Policy Foundation ("TPPF") and Citizens for a Sound Economy ("CSE")—requested that the SBOE permit additional public comment on the proposed textbooks prior to the scheduled vote. The SBOE agreed, and scheduled a public hearing for November 8, 2001, the day before the final vote on the proposed textbooks was scheduled. Appellants also allege that Defendant-Appellees McLeroy, Shore, and Thornton—all members of the Board—worked with TPPF and CSE to "develop a strategy for rejecting Chiras' book." After the public hearing, at which members of TPPF and CSE spoke in opposition to approving ENVIRONMENTAL SCIENCE, the Board voted not to adopt Chiras' book by a vote of 10-5.

7

The SBOE issued no formal findings or reasons for its decision to reject ENVIRONMENTAL SCIENCE. However, Appellants identify three comments by Board members which they allege demonstrate an unconstitutional motivation to reject the textbook. First, Appellee McLeroy wrote an article published on the CSE website in which he suggested that the SBOE rejected Chiras' textbook because it was based on a "false premise" and that the textbook's "claim that the root cause of environmental problems is economic growth is simply wrong." Second, the *Austin American-Statesman* reported that Appellee Shore told the newspaper that "[t]he oil and gas industry should be consulted" regarding passage of proposed environmental science textbooks, because "[w]e [the oil and gas industry] always get a raw deal." Third, the *Dallas Morning News* reported that Appellee Bradley told the newspaper that the Board was "seeing a change in the attitude of publishers. They are starting to work with conservative groups and textbook critics ... who more accurately reflect the viewpoint of most Texans. I really think the pendulum is swinging back to a more traditional, conservative value system in our schools."

C.

Following the Board's decision to reject Chiras' textbook, Appellants filed this action on the theory that the Board's decision constituted impermissible viewpoint discrimination in violation of the Free Speech Clause of the First Amendment. Appellees moved to dismiss, and the district court granted that motion after concluding that school officials may permissibly discriminate on the basis of viewpoint when selecting materials for inclusion in the public school curriculum.

The district court reasoned that the selection and use of a textbook by the public schools is neither pure government speech nor pure private speech, but rather private speech which bears the imprimatur of the government. As a result, the district court applied the forum analysis articulated by the Supreme Court in Hazelwood School District v. Kuhlmeier, 484 U.S. 260 (1988). In Hazelwood, a high school principal had removed from a school newspaper two pages which contained articles describing students' experiences with pregnancy and the divorce of their parents. Id. at 263. The Supreme Court determined that the school newspaper was a nonpublic forum, and held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive

activities so long as their actions are reasonably related to legitimate pedagogical concerns." Id. at 273.

Applying the rule of Hazelwood, the district court concluded that Hazelwood did not require the Board's decision to be viewpoint neutral, and that the motivations for the Board's decision alleged by Appellants were "reasonably related to legitimate pedagogical concerns."  This appeal followed.

## II.

We review the district court's grant of a Rule 12(b)(6) motion to dismiss de novo.  S. Christian Leadership Conference v. Supreme Ct. of La., 252 F.3d 781, 786 (5th Cir. 2001).  In reviewing the district court's ruling we must treat all facts pleaded as true, and should construe the pleadings in the manner most favorable to the non-moving party.  Id.  We should not grant such a motion unless it appears beyond doubt that there is no set of facts on which plaintiff is entitled to relief.  Id.  To avoid dismissal, however, a plaintiff must plead specific facts, rather than conclusory allegations.  Guidry v. Bank of LaPlace, 954 F.2d 278, 281 (5th Cir.1992).

## III.

Appellants argue that the district court erred in concluding both that Hazelwood does not require the SBOE's decision to be viewpoint-neutral and that the Board's reasons for its decision were "reasonably related to legitimate pedagogical concerns." Appellees argue, however, that the selection and use of textbooks in the public schools is government speech, not a forum, and not subject to the First Amendment rights of either textbook authors or students. Appellees argue, alternatively, that if the district court was correct in applying the Hazelwood framework, the court was correct when it concluded that viewpoint neutrality is not required.

### A.

The first question we must answer is whether Appellant Chiras alleged a violation of his First Amendment rights as a textbook author by the SBOE when it declined to place his textbook on the conforming or nonconforming list of textbooks for use in public school classrooms. Although the Supreme Court has not answered this question directly, the Court has given us ample guidance to allow us to comfortably answer in the negative.

### 1.

Any discussion of the constitutionality of a state's decision to reject a textbook for its public schools must begin

11

with the recognition that the states enjoy broad discretionary powers in the field of public education. Central among these discretionary powers is the authority to establish public school curricula which accomplishes the states' educational objectives. See Bd. of Educ. v. Pico, 457 U.S. 853, 864 (1982); Ambach v. Norwick, 441 U.S. 68, 76 77 (1979).

In Milliken v. Bradley, 418 U.S. 717, 741 (1974), Chief Justice Burger wrote: "No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process." Similarly, in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 50 (1973), the Court observed that local control over the educational process affords citizens an opportunity to participate in decision making, permits the structuring of school programs to fit local needs, and encourages "experimentation, innovation, and a healthy competition for educational excellence."

The Supreme Court, therefore, has cautioned that all First Amendment rights accorded to students must be construed "in light of the special characteristics of the school environment," and

12

that the federal judiciary should not "intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."  Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 506 (1969);  Epperson v. Arkansas, 393 U.S. 97, 105 (1968).[25]

The Court's guidance regarding our limited review of the broad authority of the school board over its own policy has been amplified by the Court's recent cases addressing government's authority over its own message.  The government undoubtedly has the authority to control its own message when it speaks or advocates a position it believes is in the public interest.  For example, in Rust v. Sullivan, the Supreme Court addressed the federal government's prohibition on abortion-related advice applicable to recipients of federal funds for family planning counseling, which the petitioners claimed impermissibly discriminated based on viewpoint.  500 U.S. 173, 192-200 (1991).

---

[25] We do not address in this case allegations that a governmental entity chose to speak in a way that the substance of the speech might itself violate a provision of the Constitution, such as the Establishment Clause.  See, e.g., Epperson, 393 U.S. at 106-07. Instead, we address only claims that the SBOE denied a textbook author access to the list of approved textbooks and denied students the information contained in the textbook.

13

The Court held that the prohibition was permissible under the First Amendment, because:

> "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In doing so, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other. A legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right."

Id. at 193. The "basic difference" observed by the Court is that "between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." Id.

In Rosenberger v. Rector and Visitors of the University of Virginia, the Supreme Court addressed the power of the government to restrict speech in the educational context. 515 U.S. 819 (1995). The University of Virginia created a program through which it paid the printing costs of a variety of student publications. Id. at 822. However, the University withheld authorization for payments on behalf of a student paper called *Wide Awake: A Christian Perspective at the University of Virginia*, because the paper "primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality."

14

Id. at 822-23.  The Supreme Court invalidated the University's restriction, concluding that the University had engaged in impermissible viewpoint discrimination.  Id. at 837.

In reaching its conclusion in Rosenberger, however, the Court acknowledged that schools have particularly broad discretion when making funding decisions regarding their own curriculum: "Nor do we question the right of the University to make academic judgments as to how best to allocate scarce resources."  Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 833 (1995) (quoting Widmar v. Vincent, 454 U.S. 263, 276 (1981)).  The University, however, did not receive the benefit of the broad discretion normally afforded to an educational institution regarding its curriculum, because the Court found that the fund for student publication was a forum, subject to the viewpoint neutrality restriction.  Id. at 829-30.

The Court was careful to distinguish a school's decision to "expend[] funds to encourage a diversity of views from private speakers" from a school's  decision regarding its own message.  Id. at 834.  The Court noted that "[a] holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the

15

University's own speech, which is controlled by different principles." Id. The Court also made it clear that the university could speak not only through its own employees, but also through third parties: "When the University *determines the content of the education it provides*, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker *or when it enlists private entities to convey its own message*." Id. at 833 (emphasis added). The Court in Rosenberger noted that its decision was consistent with the principles it had applied in Rust. Although "the government did not create a program to encourage private speech but instead *used private speakers to transmit specific information pertaining to its own program*, ... when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." Id. at 833 (citing Rust, 500 U.S. at 194)(emphasis added).

The Supreme Court's decisions in Rosenberger and Rust elucidate two points that are key in analyzing Chiras' claim. First, in establishing and implementing certain governmental functions, the government, including its educational institutions, has the discretion to promote policies and values

16

of its own choosing free from forum analysis or the viewpoint-neutrality requirement. Second, the government retains this discretion even where it chooses to employ private speakers to transmit its message. The Supreme Court has confirmed and clarified these two principles in three other analogous cases, reasoning that when a governmental entity must exercise editorial judgment in choosing among private speakers to facilitate the government's own message, the government's decision is not subject to forum analysis or the viewpoint neutrality requirements.

First, in Arkansas Educ. Television Comm'n v. Forbes, the Supreme Court addressed claims by an independent political candidate that a state-owned public television broadcaster excluded the candidate from a debate. 523 U.S. 666, 669 (1998). Although the Court concluded that under the circumstances of the case the broadcaster had created a nonpublic forum by hosting a political candidate debate, the Court limited its holding by stating that under ordinary circumstances, public broadcasters exercise a wide degree of discretion when making programming decisions. Id. at 673 (1998) ("As a general rule, the nature of editorial discretion counsels against subjecting broadcasters to claims of viewpoint discrimination."). The Court compared the

17

discretion held by public broadcasters directly to that held by school boards:

> "Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or **a public school prescribing its curriculum**, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others. Were the judiciary to require, and so to define and approve, pre-established criteria for access, it would risk implicating the courts in judgments that should be left to the exercise of ... discretion."

Id. at 674 (emphasis added).

The Court in Forbes contrasted the exercise of editorial discretion to the decision to fund a generalized array of speech, such as university-funded student publications. Id. at 673 (citing Rosenberger, 515 U.S. 819). The Court reasoned that "[i]n the case of television broadcasting, however, broad rights of access for outside speakers would be antithetical, as a general rule, to the discretion that stations and their editorial staff must exercise to fulfill their journalistic purpose and statutory obligations." Id. The Court concluded that "public broadcasting as a general matter does not lend itself to scrutiny under the forum doctrine...." Id. at 675.[26]

---

[26] This court anticipated the reasoning of the Forbes decision in Muir v. Alabama Education Television Commission, where we addressed claims that public television licensees had violated the First Amendment by canceling a previously scheduled program. 688 F.2d 1033 (5th Cir. 1982), cert. denied, 460 U.S. 1023 (1983). Just as in Forbes, we concluded in Muir that a public broadcaster is not normally a forum, and

18

Second, the Court in <u>Nat'l Endowment for Arts v. Finley</u>, 524 U.S. 569 (1998), upheld an art funding program that required the NEA to use content based criteria in making funding decisions. The Court explained that "[a]ny content based considerations that may be taken into account in the grant making process are a consequence of the nature of artistic funding." <u>Id.</u> at 585. In particular, "[t]he very assumption of the NEA is that grants will be awarded according to the 'artistic worth of competing applicants,' and absolute neutrality is simply inconceivable." <u>Id.</u> The Court expressly declined to apply forum analysis, reasoning that it would conflict with "NEA's mandate ... to make esthetic judgments, and the inherently content based 'excellence' threshold for NEA support." <u>Id.</u> at 586.

Third, and most recently, the Court concluded that forum analysis was inappropriate in <u>United States v. Am. Library Ass'n, Inc.</u>, 539 U.S. 194 (2003). In <u>ALA</u>, the Court addressed claims that the Children's Internet Protection Act, which required public libraries to use internet filters as a condition for

therefore private speakers may not claim a right of access to broadcast content of their choosing. <u>Id.</u> at 1041-43. Moreover, we held that public broadcasters are not precluded by the First Amendment from exercising editorial control over their own chosen messages. <u>Id.</u> at 1043-44. "In exercising their editorial discretion state officials will unavoidably make programming decisions which can be characterized as 'politically motivated.'" <u>Id.</u> at 1044.

19

receipt of federal subsidies, violated the First Amendment.  In that case, the Court found that "[j]ust as forum analysis and heightened judicial scrutiny are incompatible with the role of public television stations and the role of the NEA, they are also incompatible with the discretion that public libraries must have to fulfill their traditional missions." Id. at 205. "Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them."  Id.; see also Mark G. Yudof, Personal Speech and Government Expression, 38 CASE W. RES. L. REV. 671, 687 (1987) ("Even in the school library, the librarian must normally implement the board's decisions, and certainly the writers of the books do not have a constitutional right to determine what books will be acquired.").

Similarly, when the SBOE devises the state curriculum for Texas and selects the textbook with which teachers will teach to the students, it is the state speaking, and not the textbook author.  Designing the curriculum and selecting textbooks is a core function of the SBOE.  It is necessary for the Board to exercise editorial judgment over the content of the instructional materials it selects for use in the public school classrooms, and the exercise of that discretion will necessarily reflect the viewpoint of the Board members.  The purpose of the Board is not

to establish a forum for the expression of the views the various authors of textbooks and other instructional materials might want to interject into the classroom. The Board does not encourage a "diversity of views," contemplated by the Supreme Court in Rosenberger, but instead "enlists private entities to convey its own message." Further, the Board has a statutory obligation under Texas law to exercise that discretion in order to promote the state's chosen message through the Board's educational policy. As noted above, the Texas Education Code requires that the Board "foster the continuation of the tradition of teaching United States and Texas history and the free enterprise system in regular subject matter and in reading courses and *in the adoption of textbooks*." TEXAS EDUC. CODE § 28.002(h) (emphasis added).

Because the Board must necessarily exercise its editorial discretion in selecting which private entities will convey the message the state selects, forum analysis and the viewpoint neutrality requirement are inapposite in this case. As a result, there is no forum to which Appellant Chiras can claim access as a textbook author.

2.

Much of the Appellants' claim depends on the argument that the SBOE's decision in this case is subject to the restrictions

21

developed by the Supreme Court in <u>Hazelwood</u>.   In <u>Hazelwood</u>, a high school principal removed several pages of a school newspaper containing an article describing student's experience with pregnancy and an article on the impact of divorce on students. 484 U.S. at 263.  The Court found that the school newspaper was a nonpublic forum, established to allow students to express themselves within the context of the school's curriculum and under the supervision of school officials.   <u>Id.</u> at 270.   The Court concluded that regulation by the school was permissible so long as "editorial control over the style and content of student speech in school-sponsored expressive activities is reasonably related to legitimate pedagogical concerns."   <u>Id.</u> at 273. Appellants argue that <u>Hazelwood</u> also requires that the editorial control be exercised in a viewpoint-neutral manner.[27]

_____

[27] A split exists among the Circuits on the question of whether <u>Hazelwood</u> requires viewpoint neutrality. <u>Compare</u> <u>Fleming v. Jefferson County Sch. Dist.</u>, 298 F.3d 918, 928 (10th Cir. 2002) ("We hold ... that <u>Hazelwood</u> does not require educators' restrictions on school-sponsored speech to be viewpoint neutral.") <u>and</u> <u>Ward v. Hickey</u>, 996 F.2d 448, 454 (1st Cir. 1993) ("[T]he Court in <u>Kuhlmeier</u> did not require that school regulation of school-sponsored speech to be viewpoint neutral.") <u>with</u> <u>Planned Parenthood of S. Nev., Inc. v. Clark County Sch. Dist.</u>, 941 F.2d 817, 830 (9th Cir. 1991) ("Because their decision to limit access, whether wise or unwise, is reasonable and not an effort at viewpoint discrimination, the school district did not violate the first amendment in declining to publish Planned Parenthood's advertisements.") <u>and</u> <u>Searcey v. Harris</u>, 888 F.2d 1314, 1319 n. 7 (11th Cir.1989) ("<u>Hazelwood</u> ... does not alter the test for reasonableness in a nonpublic forum such as a school but

22

Hazelwood is comparable to the Supreme Court's decision in Forbes. In Forbes, the Court outlined the general proposition that a public broadcaster, acting as an arm of the state, normally speaks as the government, and exercises control over its own message unrestricted by forum analysis or the viewpoint-neutrality requirements. 523 U.S. 673-74. Nonetheless, a public broadcaster may become subject to those requirements under certain circumstances, such as when it creates a forum by holding and televising a debate for political candidates. Id. at 678-82. Similarly, the school in Hazelwood became subject to those same requirements when it created a student newspaper as a forum for student expression. 484 U.S. at 263. However, just as a political candidate's debate is an exception to the general rule that state-owned media engages in government speech by selecting and broadcasting programs, so too is the student newspaper an exception to the general rule that schools engage in government speech when they set and implement education policy through the curriculum.

---

rather provides the context in which the reasonableness of regulations should be considered.... [T]here is no indication that the [Hazelwood] Court intended to drastically rewrite First Amendment law to allow a school official to discriminate based on a speaker's views.") Because we conclude that Hazelwood does not apply in this case, we do not consider whether Hazelwood requires viewpoint neutrality.

In order to apply Hazelwood's principles, we would have to find that the SBOE opened its lists of conforming and nonconforming textbooks as a forum, to which textbook authors and publishers might claim a right of access.  We have already concluded that the SBOE has not done so, and instead created a program by which the state sets and implements its educational policy.  Although the state may utilize private textbook authors, it does so to facilitate transmission of its own approved message, not a message of the authors' choosing.[28]

We note that there is no strong consensus among the circuit courts regarding the application of First Amendment principles to the selection of curricular materials by school boards.  However, our conclusion that the selection and use of textbooks in the public school classrooms constitutes government speech, and therefore that Hazelwood does not apply, is consistent with the Ninth Circuit's conclusion in Downs v. Los Angeles Unified Sch. District., 228 F.3d 1003, 1012 (9th Cir. 2000).  In Downs, the

---

[28] Appellants argue that application of Hazelwood is mandated by this court's decisions in Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330 (5th Cir. 2001) ("Chiu I"), and Chiu v. Plano Indep. Sch. Dist., 339 F.3d 273 (5th Cir. 2003) ("Chiu II").  However, both Chiu I and Chiu II address allegations that parents were restricted from distributing flyers, leaflets, and posters criticizing a school program at public meetings on school premises.  Both cases are examples of allegations that a governmental entity acted to restrict private speech in a forum context, and therefore, like Hazelwood, are easily distinguishable from the facts of this case.

24

court addressed the claims of a teacher challenging the constitutionality of the actions of school officials in refusing to allow him to post materials on a bulletin board relating to the school's gay and lesbian awareness month. Id. at 1005-08. Just as here, the district court had found that the bulletin board constituted a nonpublic forum and applied the rule of Hazelwood, concluding that the school's restrictions were "reasonably related to legitimate pedagogical concerns," and need not be viewpoint-neutral. Id. at 1008. The Ninth Circuit, however, concluded that the bulletin boards were government speech, and not a case of an educational institution "opening up a forum for either unlimited or limited public discussion." Id. at 1012. Instead, the boards "served as an expressive vehicle for the school board's policy of 'Educating for Diversity.'" Id.

However, at least one circuit has applied the "legitimate pedagogical concern" prong of Hazelwood to the removal of a textbook because of objections to its vulgarity and sexual explicitness. See Virgil v. Sch. Bd. of Columbia County, 862 F.2d 1517, 1521 (11th Cir. 1989).[29] We note, however, that the

[29] A few circuits have also applied the Hazelwood standard to a teacher's instructional speech. See, e.g., Vanderhurst v. Colorado Mountain Coll. Dist., 208 F.3d 908, 913-14 (10th Cir. 2000); Lacks v. Ferguson Reorganized Sch. Dist., 147 F.3d 718, 724 (8th Cir. 1998); Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ., 42 F.3d 719, 723-24 (2nd Cir. 1994); Ward v. Hickey, 996 F.2d 448, 452 (1st Cir. 1993); Webster v.

_Virgil_ court applied the _Hazelwood_ standard without finding that any forum had been created by the school, ignoring a necessary precondition. Moreover, _Virgil_ was decided before _Rust_, _Rosenberger_, _Forbes_, _Finley_, and _ALA_, and therefore did not have the benefit of the Supreme Court's clarification of the government's authority over its own message, whether it speaks through its own employees or through private parties. To the extent _Virgil_ suggests that the selection of instructional materials by a school board is not generally government speech, we disagree.[30]

_New Lenox Sch. Dist._, 917 F.2d 1004, 1008 (7th Cir. 1990). However, several circuits, including our own, have recognized that a teacher's instructional speech is ordinarily governed by the specialized standard developed in _Pickering v. Bd. of Educ._, 391 U.S. 563 (1968) and _Connick v. Myers_, 461 U.S. 138 (1983). _See_ _Kirkland v. Northside Indep. Sch. Dist._, 890 F.2d 794, 797-800 (5th Cir. 1989); _see also_ _Boring v. Buncombe County Bd. of Educ._, 136 F.3d 364, 368-69 (4th Cir. 1998) (en banc); _Nicholson v. Bd. of Educ., Torrance Unified Sch. Dist._, 682 F.2d 858, 864-65 (9th Cir. 1982). Under _Pickering-Connick_, a public employee's speech in effect receives no First Amendment protection unless it involves a matter of public concern. _Kirkland_, 890 F.2d at 799. Although _Hazelwood_ may plausibly apply to a teacher's speech in cases where the school has created a forum, we do not address such a situation here.

[30] Our conclusion is also consistent with several pre-_Hazelwood_ cases involving school board control over textbooks. _See, e.g._, _Cary v. Bd. of Educ._, 598 F.2d 535 (10th Cir. 1979) (rejecting claim that first amendment rights of high school teachers were violated when school board banned from optional instructional use ten non-obscene books out of a list of 1285 previously approved for elective language arts classes for eleventh and twelfth grade students); _Zykan v. Warsaw Cmty Sch. Corp._, 631 F.2d 1300, 1306 (7th Cir. 1982) (finding no

3.

In considering the appropriate analytical framework in which to judge the Board's decision to reject Chiras' textbook, the district court concluded that the selection and use of textbooks by the Board is not government speech, but instead private speech which bears the imprimatur of the government.  In doing so, the district court relied on a four-factor test adopted by the Tenth Circuit to determine whether speech is that of the government or of a private speaker:  (1) whether the "central purpose" of the project is to promote the views of the private speaker; (2) whether the government exercised "editorial control" over the content of the speech; (3) whether the government was the "literal speaker"; and (4) whether "ultimate responsibility" for the project rested with the government.  Chiras v. Miller, 2004 WL 1660388, *6 (N.D. Tex. July 23, 2004) (citing Fleming v. Jefferson County Sch. Dist., 298 F.3d 918, 923 (10th Cir. 2002); Wells v. City & County of Denver, 257 F.3d 1132, 1141 (10th Cir. 2001)).

---

cognizable constitutional violation in school board's prohibition against use of certain books in course, where it was not alleged that the board sought to "impos[e] some religious or scientific orthodoxy or a desire to eliminate a particular kind of inquiry generally"); Minarcini v. Strongsville City Sch. Dist., 541 F.2d 577 (6th Cir. 1976) (upholding school board action, over objection of faculty committee, refusing to purchase three novels for classroom use and prohibiting their assignment as supplementary reading).

27

Because we conclude that the selection of curricular materials by the Board is clearly government speech based on the principles applied by the Supreme Court in Rust, Rosenberger, Forbes, Finley, and ALA, we need not adopt this multi-factor test in order to resolve this dispute. However, we note that the application of the test in this case produces a result consistent with our conclusion. The district court found that the "central purpose," "editorial control," and "ultimate responsibility" factors all weighed in favor of finding that the use and selection of textbooks in public schools constitutes government speech. The district court found that only the "literal speaker" factor weighed in favor of finding that the use of the textbook was the private speech of Chiras. Nonetheless, the district concluded on the basis of this single factor that the speech in the case was not government speech, but rather private speech which bears the imprimatur of the government.

By giving the "literal speaker" factor determinative weight, the district court runs afoul of the admonition by the Supreme Court that the government may "regulate the content of what is or is not expressed when it is the speaker or *when it enlists private entities to convey its own message*." Rosenberger, 515 U.S. at 833 (emphasis added). If the "literal speaker" factor

were enough on its own to outweigh the government's purpose, responsibility, and editorial control, the government could never enlist a private entity to convey its own message, an outcome inconsistent with settled law. Because the Board exercises "editorial control" and "ultimate responsibility" over the selection of textbooks and serves the "central purpose" of promoting the state's message as required by statute, the Tenth Circuit's four-factor test weighs heavily in favor of concluding that the selection and use of textbooks by the Board is government speech.[31]

Because we conclude that the Board's selection of textbooks is government speech, Hazelwood does not apply, and there is no

---

[31] This conclusion is, again, consistent with the approach of the Ninth Circuit in Downs v. Los Angeles Unified School District, 228 F.3d 1003, 1011-12 (9th Cir. 2000). In that case, the court applied an "actual responsibility" test, and because "the school district and the school board were in fact responsible for 1) the recognition of Gay and Lesbian Awareness month and 2) the content of bulletin boards through school principals' oversight," the court distinguished Downs' claims from other cases, like Hazelwood, involving student publications. Id. The court concluded that the school board had not opened a forum for private speech which might bear the imprimatur of the school, and instead that the bulletin boards constituted government speech, because the boards "served as an expressive vehicle for the school boards' policy...." Id. at 1012. The same is true in this case. The SBOE bears "actual responsibility" both for setting the state's education policy and for implementing that policy by selecting appropriate textbooks.

29

forum to which Chiras might assert a right of access under the First Amendment.

B.

Our conclusion that the SBOE's selection and use of textbooks in public school classrooms is government speech and not a forum for First Amendment purposes means only that Appellant Chiras may not assert a cognizable right of access to the approved list of textbooks. The conclusion that no forum exists in this case does not necessarily preclude, however, Appellant Rodriguez's asserted right as a student to receive the information in Chiras' textbook from the school. Therefore, the second question we must answer is whether Appellant Rodriguez alleged a violation by the SBOE of her First Amendment rights as a student when it declined to place Chiras' textbook on the conforming or nonconforming lists.

Appellants' primary claim to support for a student's right to receive information is the Supreme Court's decision in Board of Education v. Pico, 457 U.S. 853 (1982). In that case, the Court addressed the decision of a school board to remove certain books it found objectionable from a school library. The Court, in a plurality opinion authored by Justice Brennan, concluded that a student may assert a cognizable right to receive ideas,

30

which restricts the ability of the school to exercise discretion over the materials removed from the school library.  See id. at 867-68.[32]   However, the Court carefully circumscribed that potential right, acknowledging that the case "does not involve textbooks" and that the Court's conclusion "does not intrude into the classroom, or into the compulsory courses taught there."  Id. at 862.  Indeed, the Court readily admitted that a school board "might well defend their claim of absolute discretion in matters of *curriculum* by reliance upon their duty to inculcate community

---

[32]   As this court noted in Muir v. Alabama Educ. Television Comm'n, the opinions of the Justices in Pico are highly fractured.  See 688 F.2d 1033, 1045 n. 30 (5th Cir. 1982).  A majority of the Justices did not join any single opinion.  The plurality opinion was joined by Justices Marshall and Stevens.  Justice Blackmun concurred in part, but dissented from the plurality's conclusion that the "right to receive information" imposes a duty upon the state to provide information or ideas.  See Pico, 457 U.S. at 878-79 (Blackmun, J., concurring in part).  Chief Justice Burger and Justices Powell, Rehnquist, and O'Connor all dissent, agreeing with Justice Blackmun that there is no duty imposed on the state to provide continuing access to particular books.  Id. at 888-89 (Burger, C.J., dissenting).  Justice White concurred in the judgment of the Court on the narrowest grounds, concluding that the factual support for summary judgment was lacking, and that the case should be remanded for further factual development.  Id. at 883-84 (White, J., concurring).  As a result, this court concluded in Muir that Pico has no precedential value as to the application of First Amendment principles to the school's decision to remove the books from the library.  Muir, 688 F.2d at 1045 n.30 (citing Marks v. United States, 430 U.S. 188, 192-93 (1977); Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976)).  Indeed, Chief Justice Burger noted in his dissent that the Court's decision contained no binding holding.  Pico, 457 U.S. at 886 n. 2 (Burger, C.J., dissenting).

31

values."  Id. at 869 (emphasis in original); see also Mark G. Yudof, Personal Speech and Government Expression, 38 Case W. Res. L. Rev. 671, 683 (1987) ("If the expression is governmental and not personal, students generally may not interfere with the school's articulation of its own education messages.  They do not have a constitutional right to add or delete a course from the curriculum, alter the teacher's lesson plan, or scrutinize the school district's choice of textbooks.").  Because Pico addressed the removal of an optional book from the school library, not the selection of a textbook for use in the classroom, we decline to apply Pico to the facts before us.

Even if we were to assume *arguendo* that the students' right to receive knowledge recognized by Justice Brennan's plurality opinion in Pico controlled our decision in this case, the Board's decision to exclude Chiras' textbook from the conforming and nonconforming lists is firmly within the scope of its discretion. Justice Brennan states in Pico:

> Petitioners rightly possess significant discretion to determine the content of their school libraries.  But that discretion may not be exercised in a narrowly partisan or political manner.  If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students....  The same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to

32

> remove all books authored by blacks or advocating racial equality and integration.

Id. at 870-71. Justice Rehnquist was willing to "cheerfully concede" this principle in his dissent. Id. at 907 (Rehnquist, J., dissenting). Whether a decision to exclude content is "narrowly partisan or political," in turn, "depends upon the motivation behind [the school officials'] actions." Id. at 871.

Appellants, however, fail to plead any specific facts which demonstrate that the SBOE's decision was motivated by "narrowly partisan or political" considerations. Although ten of the SBOE members voted against approval of Chiras' textbook, Appellants have identified only three comments by Board members which they allege demonstrate their claims. Moreover, only one of these comments refers specifically to Chiras' textbook. Appellants allege that Appellee McLeroy wrote an article published on the CSE website in which he suggested that the SBOE rejected Chiras' textbook because it was based on a "false premise" and that the textbook's "claim that the root cause of environmental problems is economic growth is simply wrong." While there may be political controversy surrounding environmental issues, Appellants offer no facts to suggest that McLeroy's comments were based on partisan, rather than scientific disagreement.

33

Of the other two comments alleged by Appellants, neither actually refers to Chiras' textbook. The *Austin American-Statesman* reported that Appellee Shore told the newspaper that "[t]he oil and gas industry should be consulted" regarding passage of proposed environmental science textbooks, because "[w]e [the oil and gas industry] always get a raw deal." The *Dallas Morning News* reported that David Bradley told the newspaper that the Board was "seeing a change in the attitude of publishers. They are starting to work with conservative groups and textbook critics ... who more accurately reflect the viewpoint of most Texans. I really think the pendulum is swinging back to a more traditional, conservative value system in our schools." Neither comment suggests that the motivation for rejecting Chiras' textbook was "narrowly partisan or political."

The SBOE may permissibly exercise a wide degree of discretion in performing its traditional function of selecting a curriculum which promotes the state's chosen educational policy. In doing so, it will necessarily reject some instructional material to which some students may desire to have access. Nonetheless, where the Board is selecting textbooks for use in the classroom, students have no constitutional right to compel the Board to select materials of their choosing. As a result,

34

Appellant Rodriguez has no cognizable right to compel the Board to place Chiras' textbook on the approved list of textbooks.

IV.

We affirm the district court's judgment dismissing Appellants' First Amendment claims, although we do so on different grounds. First, the selection of textbooks by the state for use in public school classrooms is government speech, and is not subject to the forum analysis of <u>Hazelwood</u> or the viewpoint neutrality requirement. As a result, there is no forum to which Appellant Chiras can claim a right of access. Second, even assuming that public school students possess a cognizable right to receive information, that right does not extend to the selection of textbooks for use in the classroom. Because we conclude that Appellant Chiras has not stated a claim as a textbook author to access the Board's list of approved textbooks and Appellant Rodriguez has not stated a claim as a student to compel the Board to select textbooks of her choosing, we affirm the district court's judgment in favor of Appellees.

AFFIRMED.