Theodore GRISWOLD, et al., Plaintiffs,

v.

David P. DRISCOLL, et al., Defendants.

C.A. No. 05–12147–MLW.

United States District Court, D. Massachusetts.

June 10, 2009.

---

Harvey A. Silverglate, Cambridge, MA, Norman S. Zalkind, David Duncan, Zalkind, Rodriquez, Lunt & Duncan LLP, Philip G. Cormier, Good & Cormier, Boston, MA, for Plaintiffs.

David A. Guberman, Office of the Attorney General, Trial Division, William W. Porter, Attorney General's Office, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER

WOLF, District Judge.

## I. SUMMARY

In 1998, the Massachusetts Legislature directed the state Board of Education (the "Board") to prepare and distribute to all school districts an advisory Curriculum Guide for teaching about genocide and human rights. The Convention on the Prevention and Punishment of the Crime of Genocide, which was adopted by the United Nations in 1951, defines "genocide" as an effort intended to "destroy, in whole or in part, a national, ethnic, racial, or religious group" by killing members of the group or in other ways. The act requiring

the preparation of the Curriculum Guide expressly provided that it could include materials concerning "the Armenian genocide." 1998 Mass. Acts. 1154 (the "Act").

The Curriculum Guide as originally drafted pursuant to the Legislature's direction included a section on the "Armenian Genocide," that began, "[i]n the 1890's, and during World War I, the Muslim Turkish Ottoman Empire destroyed large portions of its Christian Armenian minority population." Massachusetts Guide to Choosing and Using Curricular Materials on Human Rights (Draft, Jan. 15, 1999).

After the issuance of the draft Guide, a Turkish group urged the Commissioner of Education to revise the Guide to include references to sources supporting the viewpoint that the fate of the Armenians did not result from a Turkish policy of genocide, but rather from other factors, including an Armenian revolt in alliance with Russia against the Ottoman Empire. The parties refer to such sources as "contra-genocide" materials. In response to this request, the Commissioner added references to several contra-genocide websites to the Guide which was filed with the Legislature in March, 1999.

The inclusion of references to the contra-genocide websites in the Guide prompted a strong response from the Armenian community and its supporters. They urged then Governor Paul Cellucci to have those references removed from the Guide. The Commissioner subsequently removed the references to the contra-genocide websites from the Guide in June, 1999.

In August, 1999, Turkish groups, including the Assembly of Turkish American Associations (the "ATAA"), complained about the removal of the contra-genocide websites. However, the Commissioner did not restore the references to the contra-genocide websites. Rather, he responded that the Legislature had encouraged the inclusion in the Guide of materials concerning the "Armenian genocide" and, he wrote, it would be inconsistent with that direction to include references that rejected the idea that a genocide had occurred. The Commissioner did, however, note that the Guide was only advisory, school districts could develop their own approaches to teaching about the matter in controversy, and the Turkish community was free to advocate its viewpoint. The Commissioner recommended that if the Turkish community wished to pursue its concerns, it do so through "legislative channels." Second Amended Complaint (the "Complaint" or "Comp.") ¶ 30, Ex. 14.

In 2005, this case was filed pursuant to 42 U.S.C. § 1983. The plaintiffs are: three students, Theodore Griswold, Jennifer Wright, and Daniel Glanz; their respective fathers and next friends, Thomas Griswold, Raymond Wright, and Richard Glanz; two teachers William Shechter and Lawrence Aaronson; and the ATAA. They have sued the Massachusetts Board of Education, its former Chairman James A. Peyser in his official capacity, the Massachusetts Department of Education, and its former Commissioner David P. Driscoll in his official capacity. The plaintiffs allege that the Board removed the contra-genocide websites from the Curriculum Guide solely for political, rather than educational, reasons. They contend that this was unlawful.

The defendants filed a motion to dismiss, which plaintiffs opposed. Various interested groups filed *amicus curiae* briefs. A hearing on the motion to dismiss was held.

■ For the reasons described in this Memorandum, the motion to dismiss is meritorious. In essence, public schools play a vital role in preparing students for

citizenship in our nation. Except in limited circumstances, decisions concerning what should be taught must be made by state and local school boards rather than by federal judges.

Public officials may not establish educational policies tailored to the tenets of a religious group. Nor may they compel students to profess a prescribed belief, or limit their right to express themselves in school unless the restriction is reasonably related to a legitimate educational purpose. However, none of these concerns are implicated in this case.

Public officials have the right to recommend, or even require, the curriculum that will be taught in public school classrooms. Doing so is a form of government speech, which is not generally subject to First Amendment scrutiny. There is no requirement that such government speech be balanced or viewpoint neutral. Rather, public officials generally have the right to decide what should be taught in the effort to prepare students for citizenship.

Plaintiffs do not assert that they initially had a right to have contra-genocide references included in the Curriculum Guide. However, they argue that once those materials were added they could not be removed solely for political, rather than pedagogical, reasons, as they allege occurred in this case.

This contention, however, is not correct. Public officials are generally entitled to change their minds about what is recommended or required to be taught in public school classrooms. The Supreme Court's resolution of *Board of Education v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), on which plaintiffs rely, is not inconsistent with this conclusion. In *Pico*, five Justices voted to remand for further factual development a case in which plaintiffs claimed that controversial books were removed from the school for purely political or partisan reasons. However, no opinion commanded five votes and, therefore, *Pico* is not binding precedent even on the question of whether books can be removed from a school library for political reasons. Moreover, the four Justices who expressed the view that removing books from a library for political or partisan reasons would violate the First Amendment made a sharp distinction between what is available as optional reading in a library and what is taught in the classroom, where, they recognized, public officials could prescribe the curriculum. Since *Pico* was decided in 1982, the Supreme Court has explicitly held that when the state is the speaker it can decide the content of its message, and has stated that the curriculum of public schools is a fully protected form of state speech. *See Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

It appears that reference to the contra-genocide websites was added to the Curriculum Guide because of concerns expressed by the Turkish community. Viewed in the light most favorable to plaintiffs for the purpose of deciding the motion to dismiss, the court assumes that those references were later removed in response to "political pressure" that the Armenian community put on elected and appointed officials. This, however, is not unlawful.

Politics is not a pejorative term in our nation. Properly understood, politics is the essence of democracy. It is the way that a free and vigorous people make and then change public policy. With regard to what will be taught in public school classrooms, we rely on the power of the people to elect and, if they wish, change their representatives as the means to hold them accountable for decisions concerning the

content of the curriculum. Except in limited circumstances not at issue here, this is not a role to be performed by United States judges in our federal form of government.

The facts of this case demonstrate that the plaintiffs and those who share their viewpoint concerning Armenians in the Ottoman Empire are fully capable of participating in the political process. It is in the political arena that they must seek the relief to which they are not entitled in federal court.

## II. STANDARD

Where, as here, defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "take all factual allegations as true and [ ] draw all *reasonable* inferences in favor of the plaintiff." *Rodriguez–Ortiz v. Margo Caribe, Inc.,* 490 F.3d 92, 96 (1st Cir.2007). The court must "neither weigh[ ] the evidence nor rule[ ] on the merits because the issue is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence to support their claims." *Day v. Fallon Cmty. Health Plan, Inc.,* 917 F.Supp. 72, 75 (D.Mass. 1996). A motion to dismiss should be denied if a plaintiff has shown "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 559, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Morales–Tanon v. P.R. Elec. Power Auth.,* 524 F.3d 15, 18 (1st Cir.2008)(applying the *Bell Atl.* standard to a § 1983 claim). Therefore, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal,* — U.S. —, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (emphasis added).

Ordinarily, a court will not consider documents outside of the pleadings in a motion to dismiss. *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993). From this rule, the First Circuit makes a "narrow exception for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint." *Id.* at 3–4; *see also Beddall v. State St. Bank and Trust, Co.,* 137 F.3d 12, 16–17 (1st Cir.1998) (When "a complaint's factual allegations are expressly linked to-and admittedly dependent upon-a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

Application of these principles to the Complaint and the exhibits attached to it persuades the court that the motion to dismiss is meritorious because even if the alleged facts are true, plaintiffs' constitutional rights have not been violated.

## III. FACTS

The following facts are alleged in the Complaint and accepted as true. The Board drafted the Massachusetts Guide to Choosing and Using Curriculum Materials on Genocide and Human Rights Issues (the "Curriculum Guide") pursuant to Chapter 276 of the Acts and Resolves of 1998 of the General Court of Massachusetts. 1998 Mass. Acts 1154. The Act required the Board to "formulate recommendations on Curriculum materials on genocide and human rights issues, and guidelines for the teaching of such material." The Act specifically identified the "Armenian genocide" as a topic that might be included in the recommended curriculum. It required that the recommendations be "available to all school districts in the Commonwealth on an advisory basis." *Id.* The Act also directed the Board to file

the Curriculum Guide with the Massachusetts Legislature no later than March 1, 1999.[1]

Pursuant to the Act, in January, 1995, Commissioner Driscoll circulated a draft version of the Curriculum Guide which included references to the "Armenian genocide" or "Armenian genocides." After reviewing the draft, the Turkish American Cultural Society of New England ("TACS–NE") wrote to Driscoll asking that the Curriculum Guide be revised to include references to sources for the viewpoint that the fate of the Armenians did not result from a Turkish policy of genocide, but rather from a number of other factors including an Armenian revolt in alliance with Russia against the Ottoman Empire. As indicated earlier, this viewpoint is referred to as the "contra-genocide thesis." Representatives of TACS–NE subsequently made a presentation to the Board, again urging inclusion of contra-genocide materials in the Curriculum Guide.

Driscoll asked TACS–NE to propose particular contra-genocide material for possible inclusion in the Curriculum Guide. Driscoll also referred TACS–NE to a Department of Education employee, who searched for a bibliography of contra-genocide materials. That process produced a list of recommendations including four contra-genocide websites. Though the Board did not vote to alter the Curriculum Guide,

in March, 1999, Driscoll submitted to the Legislature a version of the Curriculum Guide that included the four contra-genocide websites.

After the Curriculum Guide was filed with the Legislature, a committee of Armenian citizens wrote to then Governor Cellucci and urged that the references to contra-genocide websites be removed from the Guide. They asserted that the websites denied the Armenian genocide and, therefore, the inclusion of them was contrary to the purposes of the Act. Following these letters, in June, 1999, Driscoll removed the reference to the contra-genocide websites from the Curriculum Guide. Plaintiffs allege that Driscoll acted solely in response to political pressure from Armenian groups, Governor Cellucci, and other politicians. They assert that the excision was not influenced at all by educational concerns.

On August 10, 1999, a member of the ATAA board of directors wrote to Driscoll to protest the removal of the contra-genocide websites from the Guide. TACS–NE sent a similar letter. In response to the member of the ATAA board, Driscoll and defendant Board Chairman Peyser sent a letter stating that:

> [s]ince the legislative intent of the statute was to address the Armenian genocide and not to debate whether or not this occurred, the Board and Depart-

---

1. The Act states that:

 The board of education shall formulate recommendations on Curriculum material on genocide and human rights issues, and guidelines for the teaching of such material. Said material and guidelines may include, but shall not be limited to, the period of the transatlantic slave trade and the middle passage, the great hunger period in Ireland, the Armenian genocide, the holocaust and the Mussolini fascist regime and other recognized human rights violations and genocides. In formulating these recommendations, the board shall consult

 with practicing teachers, principals, superintendents, and Curriculum coordinators in the commonwealth, as well as experts knowledgeable in genocide and human rights issues. *Said recommendations shall be available to all school districts in the commonwealth on an advisory basis*, and shall be filed with the clerk of the house of Representatives, the clerk of the Senate, and the House and Senate chairmen of the joint committee on education, arts, and humanities not later than March 1, 1999. 1998 Mass. Acts 1154 (emphasis added).

ment of Education cannot knowingly include·resources that call this into question. The explicitness.of the statute has also forced us to reverse our earlier decision to include the website listing for the Turkish Embassy.

Six years later, on June 27, 2005, Peyser reiterated this position in a letter to plaintiffs' attorneys, stating that, "[w]e do not ... interpret Chapter 276 as authorizing the Board to adopt Curriculum guidelines that call into question whether the atrocities enumerated in the statute actually occurred."

After the removal of the contra-genocide websites from the Curriculum Guide, an Armenian group publicly claimed that its political efforts prompted this excision.

The student plaintiffs allege that because of the actions of the defendants they "may have been denied the opportunity to receive contra-genocide viewpoints in school that they believe were necessary to enable Theodore [Griswold] to arrive at an informed understanding of the historical events in question," Comp. ¶ 44, or that Jennifer Wright and Daniel Glanz "may be denied" that opportunity, *id.* ¶ 44a and 44b. The teacher plaintiffs allege that "the Defendants' excision, for political reasons, of the contra-genocide materials that they themselves determined were educationally suitable infringes upon the federal constitutional rights of teachers and students to inquire, teach and learn free from viewpoint discrimination unrelated to educational suitability." *Id.* ¶ 46. The ATAA states that it is "concerned that this censorship prejudices Turkish Americans in general and stunts education by suppressing educationally suitable materials that were initially selected for inclusion by the Department's educational experts but then excised under political pressure". *Id.* ¶ 49.

## IV. THRESHOLD ISSUES

Defendants contend that this case should be dismissed because the plaintiffs each lack standing. They also contend that it is barred by the three-year statute of limitations that applies to cases brought in Massachusetts pursuant to § 1983. *See Centro Medico del Turabo, Inc. v. Feliciano ·de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005) (because § 1983 does not include a statute of limitations, the court must use the forum state's general statute of limitations for personal injury actions); M.G.L. c. 260, § 2A (establishing a three-year statute of limitations for personal injury actions in Massachusetts).

Ordinarily, this court would decide these threshold questions before considering the merits of plaintiffs' constitutional claims in order to avoid deciding a constitutional issue unnecessarily. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Nieves–Marquez v. Puerto Rico*, 353 F.3d 108, 123 (1st Cir.2003). However, this case cannot be fully resolved based on the motion to dismiss without a thorough consideration of whether the individual plaintiffs have alleged a constitutional claim on which relief can be granted.

For § 1983 actions, the three-year statute of limitations begins to run "when the plaintiff knows, or has reason to know, of the injury on which the action is based." *Rivera–Muriente v. Agosto–Alicea*, 959 F.2d 349, 353 (1st Cir.1992). Only "when the pleader's allegations leave no doubt · that an asserted claim is time-barred" may the court dismiss a case on that basis. *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir.1998). In this case, it is not clear from the Complaint when each of the individual plaintiffs had reason to know of the alleged injury to them. Therefore, their claims cannot now

be dismissed based on the statute of limitations.[2]

■■■■■ To establish the required standing each individual plaintiff must show "that [he] ha[s] suffered an 'injury in fact'—an invasion of a judicially cognizable interest ..." *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). "For the purposes of ruling on a motion to dismiss for want of standing, [ ] the trial ... court[ ] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Accordingly, for the purposes of determining issues of standing "deciding whether there is an injury to a constitutional right often requires an inquiry into the merits of the case to determine whether a constitutional right was violated." Erwin Chemerinsky, *Federal Jurisdiction* 71 (5th ed. 2007) (citing *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *Meese v. Keene*, 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987)). This is such a case.[3]

Therefore, the court has examined whether the individual plaintiffs have alleged a constitutional claim on which relief can be granted. For the reasons described in § V, *infra*, they have not. Thus, the motion to dismiss with regard to the individual plaintiffs is being allowed both on the merits and because they lack standing to maintain their case.

## V. ANALYSIS

Plaintiffs claim that the removal of the references to the contra-genocide websites from the Curriculum Guide was solely a

---

2. It is clear from the Complaint that plaintiff ATAA knew in August, 1999, of the removal of the contra-genocide websites from the Curriculum Guide and, therefore, of the alleged injury to it because one of its board members wrote to Driscoll to complain about the removal. *See* Comp. ¶ 28. Therefore, because this case was filed in 2005, six years later, ATAA's claims are barred by the three-year statute of limitations.

Contrary to the ATAA's contention, this case does not involve an alleged continuing violation of constitutional rights that extends the statute of limitations. Chairman Peyser's 2005 letter to plaintiffs' attorney reiterating the board's explanation for the 1999 removal of the contra-genocide websites from the Curriculum Guide was essentially a refusal to remedy the effects of an alleged earlier constitutional violation and, therefore is not independently actionable as part of a serial violation. *See, e.g., De Leon Otero v. Rubero*, 820 F.2d 18, 20 (1st Cir.1987)(holding, in an employment discrimination case, that later refusals to reinstate the plaintiff did not create a continuing violation, but were "a consequence of his initial demotion").

Similarly, the ATAA has identified no ongoing policy that would constitute a systemic violation. As with serial violations, a plaintiff seeking to establish a systemic violation must allege more than the lingering effects of a past violation. *See Muniz–Cabrero v. Ruiz*, 23 F.3d 607, 611 (1st Cir.1994) (holding, in an employment discrimination case, that the continued employment of the plaintiff's rival in a position previously held by the plaintiff did not constitute a systemic violation). Only a violation in 1999 is alleged by the ATAA in this case.

3. The analysis required to decide whether an organization like the ATAA has standing is more complicated than the analysis necessary to determine individual standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Citizens to End Animal Suffering and Exploitation v. The New England Aquarium*, 836 F.Supp. 45, 50–58 (D.Mass.1993). It is, however, unnecessary to perform that analysis concerning the ATAA. Its claims are time-barred and, in any event, are unmeritorious for the reasons described in § 5, *infra*, concerning the individual plaintiffs' claims.

response to political pressure, is analogous to the removal of books from school libraries in *Pico*, and violated their First Amendment rights. Plaintiffs also at times have asserted that the excision of those materials violates a right that they have "to inquire and learn free from viewpoint discrimination unrelated to educational suitability." Pls. Opp'n to Mot. to Dismiss at 17. However, this theory was not argued by plaintiffs at the hearing on the motion to dismiss. In any event, neither of plaintiffs' contentions is correct.

▇ As indicated earlier and explained below, the Curriculum Guide is a form of government speech. As such, it is generally exempt from First Amendment scrutiny. There are exceptions to this general rule. However, none are applicable to the instant case. Contrary to plaintiff's contention, this case is not analogous to *Pico*, in which four Justices of the Supreme Court expressed the view that books could not lawfully be removed from a public school library solely because of political pressure. Indeed, in *Pico* the plurality emphasized the distinction between books in a school library and curriculum. Since *Pico* was decided, the Supreme Court has referred to decisions concerning curriculum as exempt from First Amendment scrutiny. In the circumstances of this case the decision as to what to teach about the events that the Act and the Curriculum Guide characterize as the Armenian genocide must be made by elected officials, educators, and teachers rather than by federal judges.

▇ The reasons that defendants are entitled to prevail in this case are rooted in first principles concerning the separation of powers in our federal form of government. As the Supreme Court has repeatedly written, "public schools are vitally important 'in the preparation of individuals for participation as citizens', and as vehi-

cles for 'inculcating fundamental values necessary to the maintenance of a democratic political system.'" *Pico*, 457 U.S. at 864, 102 S.Ct. 2799 (quoting *Ambach v. Norwick*, 441 U.S. 68, 76–77, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979)). "'[P]ublic education in our Nation is committed to the control of state and local authorities.'" *Id.* (quoting *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)). Therefore, state and, particularly, local school boards, "have broad discretion in the management of school affairs." *Id.* at 863, 102 S.Ct. 2799; *see also, Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir.2005). Accordingly, federal courts should not "intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *see also Pico*, 457 U.S. at 864, 102 S.Ct. 2799; *Chiras*, 432 F.3d at 611.

There are circumstances in which it is necessary and proper for federal courts to prohibit or reverse action by state or local officials concerning public schools because the conduct at issue violates the First Amendment. However, no such circumstances are alleged in this case.

▇ For example, a state law prohibiting the teaching of evolution in public schools was held to be unconstitutional because "the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma .... It forbids alike the preference of a religious doctrine or the prohibition of theory which is deemed antagonistic to a particular dogma.'" *Epperson*, 393 U.S. at 106–07, 89 S.Ct. 266. However, as confirmed at the hearing on the motion to dismiss, plaintiffs do not allege that the removal of the reference to contra-geno-

cide websites from the Curriculum Guide was religiously motivated or violates the religion clauses of the First Amendment. *See* Sept. 18, 2006 Tr. at 73.

■ Similarly, the First Amendment protects students from being compelled by law to speak in any particular way, including being required to recite the Pledge of Allegiance to the American flag. *See W. Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 634, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). However, the Curriculum Guide requires neither students nor teachers to engage in any speech. Rather, local school boards can choose whether to adopt the Curriculum Guide. The Complaint does not suggest that any of the plaintiff teachers have been compelled to instruct only in accordance with it. *See, e.g.,* Comp. ¶ 45–48.

■ The First Amendment also protects students against restrictions on their right to speak in school unless it is shown that the prohibited speech or expressive conduct would " 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.' " *Tinker,* 393 U.S. at 505, 89 S.Ct. 733 (quoting *Burnside v. Byars,* 363 F.2d 744, 749 (5th Cir.1966)). However, it is not alleged that the Curriculum Guide in any way restricts the plaintiff students right to speak. *See* Comp. ¶¶ 44, 44a, 44b.

■ A state or local school board has a greater right to restrict speech by a teacher, who is one of its representatives, if the teacher's statements are contrary to the lessons that it has decided students should be taught or is otherwise inappropriate. *See Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 23 (1st Cir.1999). As the First Circuit has written: "[A] teacher's classroom speech is part of the curriculum. Indeed, a teacher's principal classroom role is to teach students the school curriculum. Thus, schools may reasonably limit

teachers' speech in that setting." *Ward v. Hickey,* 996 F.2d 448, 453 (1st Cir.1993); *see also Downs v. Los Angeles Unified Sch. Dist.,* 228 F.3d 1003, 1014 (9th Cir. 2000). However, in this case there is no allegation that any plaintiff teacher has been prohibited from teaching as he wishes about the fate of the Armenians in the Ottoman Empire. *See* Comp. ¶¶ 45–49.

Nor is it alleged that either the student or teacher plaintiffs has been denied access in school to the contra-genocide websites that were removed from the Curriculum Guide or comparable information. Plaintiff Thomas Griswold only alleges that his son "may have been denied the opportunity to receive contra-genocide viewpoints in school . . . ." Comp. ¶ 44. The other parent plaintiffs only allege that their children "may be denied the opportunity to receive contra-genocide view points in school . . ." Comp. ¶¶ 44a, 44b. Failing to include the websites among materials which may be presented to students is not tantamount to restricting access to them. Therefore, the plaintiffs do not even allege an actual violation of any purported right to receive information in the classroom.

Moreover, in the circumstances of this case, plaintiffs do not have a right to receive contra-genocide information in the classroom. At issue here is only an advisory Curriculum Guide. It was created as a result of an Act that required defendants to include materials concerning the "Armenian genocide." 1998 Mass. Acts 1154. The Act required distribution of the Curriculum Guide to all school districts on an "advisory basis." *Id.* In this fashion the state decided what message it recommended be communicated to students as part of a human rights curriculum. Therefore, the Curriculum Guide, promulgated pursuant to and consistent with the Act, is a form of government speech. *See Rosen-*

*berger,* 515 U.S. at 833, 115 S.Ct. 2510; *Chiras,* 432 F.3d at 614.

 Generally, "the Government's own speech [ ] is exempt from First Amendment scrutiny." *Johanns v. Livestock Mktg. Ass'n,* 544 U.S. 550, 553, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005) (generic advertising funded by targeted assessment on beef producers was government speech not subject to First Amendment challenge as a compelled subsidy). Therefore, it has, for example, been held that the government may prohibit the recipients of federal funds from giving advice on family planning. *See Rust v. Sullivan,* 500 U.S. 173, 192–200, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). "[I]ndividuals . . . generally have no constitutional right to challenge government speech under the Free Speech Clause." *Summum v. Pleasant Grove City,* 499 F.3d 1170, 1181 (10th Cir.2007).

 The Supreme Court has held that decisions concerning curriculum are a form of government speech and lower courts have recognized this. In *Rosenberger,* the Supreme Court stated:

> the principle that when the State is the speaker, it may make content-based choices. When the [state] University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker. . . .

515 U.S. at 833, 115 S.Ct. 2510. Similarly, the Fifth Circuit has written that "when the [State Board of Education] devises the state curriculum for Texas and selects the textbook with which teachers will teach to the students, it is the state speaking, and not the textbook author." *Chiras,* 432 F.3d at 614. "The government undoubtedly has the authority to control its own message when it speaks or advocates a position it believes is in the public inter-

est." *Id.* at 612. The First Circuit too has stated that the Supreme Court precedents do "not require that school regulation of school sponsored speech be viewpoint neutral." *Ward,* 996 F.2d at 454; *see also Fleming v. Jefferson County Sch. Dist.,* 298 F.3d 918, 934 (10th Cir.2002) (the Supreme Court does not require educator's restrictions on school supervised speech to be viewpoint neutral).

Plaintiffs seek to escape the consequences of the general principle that government speech is immune from First Amendment scrutiny by emphasizing that the instant case allegedly involves the *removal* of contra-genocide materials from the Curriculum Guide as a result of political pressure. They assert that this case is analogous to *Pico* and, therefore, that they have stated a valid claim. Plaintiffs' reliance on *Pico* is, however, unpersuasive for several reasons.

In *Pico,* in response to complaints from "a politically conservative organization of parents," a local school board removed nine books from a high school library and another from a junior high school library. 457 U.S. at 856–57, 102 S.Ct. 2799. The school board described the books as " 'anti-American, anti-Christian, and anti-Sem[i]tic, and just plain filthy,' and concluded that '[i]t is our duty, our moral obligation, to protect the children in our schools from this moral danger as surely as from physical and medical dangers.' " *Id.* at 857, 102 S.Ct. 2799 (alterations in original) (quoting *Pico v. Bd. of Educ.,* 474 F.Supp. 387, 390 (E.D.N.Y.1979)). The school board appointed a committee to review the books and to report which of them should be retained as educationally suitable. *Id.* at 857–58, 102 S.Ct. 2799. However, the school board substantially rejected the committee's recommendations without explanation, and eliminated nearly all of the books at issue. *Id.* at 858, 102

S.Ct. 2799. The Second Circuit reversed the district court's decision that granted summary judgment for the defendants and upheld the removal of the books. *See Pico v. Bd. of Educ.*, 638 F.2d 404 (2d Cir.1980).

In a fractured decision in which no opinion commanded a majority, five members of the Supreme Court voted to remand the case for further development of the facts concerning whether the removal of the books was motivated by a political or partisan desire to deny students access to certain ideas. *Pico,* 457 U.S. at 870, 102 S.Ct. 2799. Four of the Justices expressed the view that if the decision to remove the books was purely political, it was unlawful. *See id.* at 854–75, 102 S.Ct. 2799 (Brennan, J., joined by Marshall, J., and Stevens, J.) and 875–82 (Blackmun, J.) However, the crucial fifth vote was provided by Justice Byron White, who reasoned that it was inappropriate to decide whether a purely political motive for the removal of the books would be unconstitutional unless and until such a motive for the removal was proven at trial on remand. *Id.* at 883–84, 102 S.Ct. 2799. In Justice White's view, *Pico* posed "difficult First Amendment issues in a largely uncharted field." *Id.* at 884, 102 S.Ct. 2799. Four members of the Court dissented. *Id.* at 885–97, 102 S.Ct. 2799 (Burger, C.J., Powell, J., Rehnquist, J., and O'Connor, J., dissenting).

In writing for himself and Justices Thurgood Marshall and John Paul Stevens, Justice William Brennan found that "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Id.* at 867, 102 S.Ct. 2799 (emphasis in original). Justice Brennan particularly emphasized "the unique role of the school library." *Id.* at 869, 102 S.Ct. 2799. He expressly noted that:

Respondents do not seek in this Court to impose limitations upon their school Board's discretion to prescribe the curricula of the [town's] schools. On the contrary, the only books at issue in this case are *library* books, books that by their nature are optional rather than required reading.

*Id.* at 862, 102 S.Ct. 2799 (emphasis in original). Reiterating the distinction that he made between the library and the classroom, Justice Brennan went on to state:

Petitioners might well defend their claim of absolute discretion in matters of *curriculum* by reliance upon their duty to inculcate community values. But we think that petitioners' reliance upon that duty is misplaced where, as here, they attempt to extend their claim of absolute discretion beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there holds sway.

*Id.* at 869, 102 S.Ct. 2799 (emphasis in original).

Justice Blackmun concurred in part and concurred in the judgment. *Id.* at 875, 102 S.Ct. 2799. He, however, wrote that, "I do not suggest that the State has any affirmative obligation to provide students with information or ideas, something that may well be associated with a 'right to receive.'" *Id.* at 878, 102 S.Ct. 2799. He found, however, that "the State may not act to deny access to an idea simply because state officials disapprove of that idea for partisan or political reasons." *Id.* at 879, 102 S.Ct. 2799. Nevertheless, Justice Blackmun added that, "[a]s a practical matter [ ] it is difficult to see the First Amendment right that I believe is at work here playing a role in a school's choice of curriculum." *Id.* at 878 n. 1, 102 S.Ct. 2799.

The Fifth Circuit's reasoning in *Chiras* concerning *Pico* and other issues is instructive in the instant case. *Chiras* involved a textbook on environmental issues

recommended by a state Commissioner of Education for use in public schools which was rejected by the State Board of Education after "conservative think-tank organizations" requested and received a reopening of the period for public comment. 432 F.3d at 609–10.

The author of the rejected textbook persuaded the district court that the conduct at issue was subject to the limited public forum analysis articulated by the Supreme Court in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). In *Hazelwood*, the Supreme Court held that a student newspaper was a non-public forum and, therefore, educators could only restrict the students' speech in the newspaper for reasons reasonably related to legitimate pedagogical concerns. *Id.* at 273, 108 S.Ct. 562. The Fifth Circuit, however, rejected the contention that the actions at issue were subject to *Hazelwood* analysis, finding instead that "the selection and use of textbooks in the public school classrooms constitutes government speech and therefore [ ] *Hazelwood* does not apply." *Id.* at 616 (citing *Downs*, 228 F.3d at 1012).

■ As indicated earlier, the First Circuit has interpreted *Hazelwood* the same way, writing that "the Court in [*Hazelwood*] did not require that school regulation of school-sponsored speech be viewpoint neutral." *Ward*, 996 F.2d at 454. The First Circuit has characterized *Pico* as a case which, although decided earlier, was in effect subject to the *Hazelwood* forum analysis. *See Student Gov't Ass'n v. Bd. of Trustees of Univ. of Mass.*, 868 F.2d 473, 480 (1st Cir.1989) (*Pico* is a case involving "channels of communication ( . . . school libraries) to which forum analysis is applicable."). As explained earlier, however, the First Circuit has recognized that the principle applicable to a limited public forum that requires justification for a departure from viewpoint neutrality does not apply to school sponsored speech. *See Ward*, 996 F.2d at 454. Curriculum is an integral part of such speech. *See Rosenberger*, 515 U.S. at 833, 115 S.Ct. 2510.[4]

In *Chiras*, the Fifth Circuit went on to consider the implications of *Pico* for the claim that the students had a right to receive the information in the banned text-

**4.** At the hearing on the motion to dismiss, plaintiffs briefly mentioned the delegated editorial authority doctrine as a basis for the relief they are seeking. *See* Sept. 18, 2006 Tr. at 103. As the First Circuit explained in *Student Government Association*, in cases involving a channel of communication, including the library in *Pico*, a limited public forum analysis is required. 868 F.2d at 480. A student newspaper is a paradigmatic example of such a channel of communication. *Id.* (citing cases). In such cases, "[h]aving delegated discretionary editorial functions to a subordinate body, the state is not permitted to revoke that delegation merely because it objects to the content of any specific decision clearly within the editorial authority of the subordinate body." *Id.* This rule is part of the limited public forum doctrine, which provides that "[o]nce the state has created a forum, it may not condition access to the forum on the content of the message to be communicated,

or close the forum solely because it disagrees with the messages being communicated in it." *Id.*

The delegated editorial authority doctrine does not apply in the instant case. As described above, the Curriculum Guide is not a channel for the communication of others. Rather, it is state speech. *See Rosenberger*, 515 U.S. at 833, 115 S.Ct. 2510; *Chiras*, 432 F.3d at 614. Moreover, even if the Curriculum Guide were somehow properly regarded as a limited public forum, the decision to include contra-genocide materials in the Curriculum Guide was not "clearly within the editorial authority" of the Board. *Student Gov't Ass'n*, 868 F.2d at 480. The Act suggested that the Guide include recommended curricula material concerning "the Armenian genocide." The removed contra-genocide websites are, at least arguably, inconsistent with this mandate.

book. 432 F.3d at 619–21. The Fifth Circuit noted that, as described earlier, a majority of the Justices in *Pico* did not join a single opinion and only three endorsed the concept of a possible right to receive information. *Id.* at 619 n. 32. Therefore, it correctly stated that "*Pico* has no precedential value as to the application of First Amendment principles [even] to [a] school's decision to remove [ ] books from the library." *Id.* (citing *Pico*, 457 U.S. at 886 n. 2, 102 S.Ct. 2799 (Burger, C.J., dissenting)).

In addition, noting the distinctions between the library and the classroom recognized in the opinions contributing to the plurality of Justices Brennan and Blackmun, the Fifth Circuit emphasized that in *Pico*:

> the Court carefully circumscribed [the] potential right [to receive ideas], acknowledging that the case "does not involve textbooks" and that the Court's conclusion "does not intrude into the classroom, or into the compulsory courses taught there." Indeed, the Court readily admitted that a school board "might well defend their claim of absolute discretion in matters of *curriculum* by reliance upon their duty to inculcate community values."

*Id.* at 619 (quoting *Pico*, 457 U.S. at 869, 102 S.Ct. 2799) (emphasis in original). "Because *Pico* addressed the removal of an optional book from the school library, not the selection of a textbook for use in the classroom, [the Fifth Circuit] decline[d] to apply *Pico* to the facts before [it]." *Id.* Thus, the Fifth Circuit concluded that, "even assuming that public school students possess a cognizable right to receive information, that right does not extend to the selection of textbooks for use in the classroom." *Id.* at 620. This reasoning is persuasive and equally applicable to the contra-genocide websites removed

from the Curriculum Guide even if, as plaintiffs allege, the decision to remove them was solely the result of political pressure.

This conclusion is reinforced by the fact that *Pico* was decided in 1982, thirteen years before the Supreme Court in 1995 wrote in *Rosenberger*, that when the state "determines the content of the education it provides, it is the [state] speaking and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker." 515 U.S. at 833, 115 S.Ct. 2510. The Supreme Court reiterated that when the government is speaking as to matters of curriculum, its choices are generally immune from First Amendment challenge in its 1998 decision in *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, 674, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). In *Forbes*, the Court upheld the right of a government owned television station to limit a public debate to candidates from major parties, explaining that:

> Much like a university selecting a commencement speaker ... *or a public school prescribing its curriculum,* a broadcaster by its nature will facilitate the expression of some viewpoints instead of others. Were the judiciary to require, and so to define and approve, preestablished criteria for access, it would risk implicating the courts in judgments that should be left to the exercise of ... discretion.

*Id.* at 674, 118 S.Ct. 1633. (emphasis added).

As described earlier, the Supreme Court has repeatedly emphasized that decisions concerning the content of public education are, except in limited circumstances not applicable here, to be left to the exercise of discretion by state and local officials rather than made by federal judges. *See Pico*, 457 U.S. at 864, 102 S.Ct. 2799; *Tinker*,

393 U.S. at 507, 89 S.Ct. 733; *Ambach,* 441 U.S. at 76–77, 99 S.Ct. 1589. As also described earlier, decisions concerning curriculum are a form of government speech which is generally immune from First Amendment scrutiny by the courts. *See Rosenberger,* 515 U.S. at 833, 115 S.Ct. 2510; *Chiras,* 432 F.3d at 614. This does not mean, however, that such decisions are not subject to review or that the decision makers cannot be held accountable for them. Rather:

> [t]he latitude which may exist … where the government's own message is being delivered flows in part from [the Supreme Court's] observation that 'when the government speaks … to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position.'

*Legal Services Corp. v. Velazquez,* 531 U.S. 533, 541–42, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) (quoting, *Bd. of Regents of Univ. of Wis. Sys. v. Southworth,* 529 U.S. 217, 235, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000)).

Plaintiffs allege that the removal of the contra-genocide websites from the Curriculum Guide was unlawful because it was solely a response to political pressure. However, at least with regard to curriculum, even if the decision was based only on political rather than educational considerations, the decision was permissible.

The Complaint and attached exhibits demonstrate that plaintiffs and those who share their viewpoint concerning the treatment of Armenians in the Ottoman Empire are capable of participating fully in the political process, which provides the opportunity to petition the government to alter its policies. The efforts of the ATAA and the others who share its viewpoint evidently caused the inclusion of contra-genocide materials in the Curriculum Guide for a period of time. If plaintiffs still want those materials included in the Curriculum Guide, they will have to resume their efforts to prevail in the political arena because they are not entitled to relief in federal court.

## VI. ORDER

Accordingly, it is hereby ORDERED that the Defendant's Motion to Dismiss (Docket No. 12) is ALLOWED and this case is hereby DISMISSED.